**GATEWAY INDUSTRIES, INC., a Delaware Corporation, Plaintiff,**

v.

**AGENCY RENT A CAR, INC., a Delaware Corporation, Defendant.**

**No. 80 C 1845.**

United States District Court, N. D. Illinois, E. D.

June 10, 1980.

Jeffrey R. Liebman, John J. Enright, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff.

Richard Clemens, Shalom L. Kohn, Sidley & Austin, Chicago, Ill., for defendant; Marvin Pickholz and Robert G. Markey, Arter & Hadden, Washington, D.C., of counsel.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Gateway Industries, Inc. ("Gateway.") has filed this action under section 13(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78m(d),[1]

---

1. Section 13(d)(1) provides that:

(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78l(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, pre-

seeking various equitable relief as the result of defendant Agency Rent A Car, Inc.'s ("Agency") alleged failure to comply with that statutory provision. Gateway alleges that sometime in early January, 1980, Agency became the owner of more than five percent of all outstanding shares of Gateway stock. Pursuant to Section 13(d), Agency then was required to file a Schedule 13D statement reporting (1) its identity and background; (2) the source and amount of funds used in purchasing the shares; (3) the percentage of ownership of all outstanding shares; (4) the purpose of the acquisition; (5) any interest it had in the securities of Gateway; and (6) any contracts or other

relationships Agency had with Gateway. Agency filed its 13D statement in a timely fashion. Nonetheless, Gateway argues that the 13D statement filed by Agency in January, 1980, was defective in that it failed to provide adequate information about Agency; failed to disclose the source of borrowed funds used to finance the purchase of Gateway shares; and misrepresented Agency's purpose in acquiring Gateway shares.[2]

In seeking broad-ranging equitable relief to remedy these alleged violations,[3] Gateway alleges irreparable harm both to itself and to its shareholders. Gateway argues that it has suffered irreparable harm stem-

scribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaran-

ties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

**2.** Since filing its original 13D statement on January 18, 1980, Agency has continued to acquire shares in Gateway. On February 21, 1980, Agency filed a supplemental 13D statement indicating that its ownership of Gateway shares had increased to 8.6% of all outstanding shares. On March 24, 1980, Agency filed another supplemental statement reporting that its ownership of Gateway had reached 10.5% of all shares outstanding. In its April 3, 1980, 13D statement, Agency indicated that it owned 12.15% of all outstanding Gateway shares. In its most recently filed statement, Agency reported that it had acquired 13.8% of all outstanding shares of Gateway. These supplemental 13D statements also modified in other respects the original statement filed on January 18. The only amendment which bears on the claims contained in the complaint, however, relates to the possible delisting of Gateway from the New York Stock Exchange. Paragraph 26(g) of the complaint alleges that Agency failed to disclose that its purchases of Gateway shares might cause delisting; however, Agency in its April 24 supplemental statement indicates that it intends to continue purchasing Gateway shares irrespective of the potential threat of delisting.

**3.** Gateway seeks an order of this Court divesting Agency of all shares acquired. In addition, Gateway seeks to enjoin preliminarily and permanently Agency from, *inter alia*, (a) acquiring or attempting to acquire any additional shares of Gateway; (b) voting any shares of Gateway; and (c) exercising or attempting to exercise any influence on the management of Gateway.

ming from "the confusion and uncertainty created by Agency's conduct as to the future control, management, and operation of Gateway . . ." In addition, Gateway argues that Agency's continued purchases of its shares will result in the delisting of Gateway from the New York Stock Exchange, thereby causing Gateway irreparable harm as a result of the curtailment in trading of its shares, a reduction in the liquidity of its shares, and the impairment of its ability to secure capital financing. Finally, Gateway contends that Agency's failure to comply with section 13(d) has caused irreparable harm to Gateway shareholders, who are being forced to make investment decisions without accurate information as to Agency's background and management, its source of funds, and its motive for acquisition.[4]

■ The defendant Agency has moved to dismiss the complaint on the ground that section 13(d) of the Exchange Act does not give rise to an implied private right of action for equitable relief. For the reasons that follow, the Court agrees private parties may not seek injunctive relief under section 13(d). Accordingly, this action must be dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.[5]

## I. Implied Private Rights of Action—The Governing Principles

At the outset, the Court observes, although the issue has not been addressed directly by the Supreme Court or the Seventh Circuit,[6] that the decisional authority unanimously has upheld the existence of a private right of action for injunctive relief under section 13(d).[7] *See Dan River, Inc. v. Unitex Limited,* 624 F.2d 1216 (4th Cir. 1979); *GAF Corporation v. Milstein,* 453 F.2d 709, 719 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Wellman v. Dickinson,* 475 F.Supp. 783, 817 (S.D.N.Y.1979); *W. A. Krueger Co. v. Kirkpatrick, Pettis, Smith,*

---

4. In addition to the claim based on section 13(d), Gateway has alleged that Agency's continued acquisition of shares despite the possibility of delisting, constitutes a breach of the common law fiduciary duty owed by a controlling shareholder to a corporation. Gateway seeks the same equitable relief described in note 3, *supra,* for this alleged common law violation.

5. In addition, Agency has moved to dismiss on the grounds that the complaint fails to comply with Fed.R.Civ.P. 9(b); that Count I fails to state a claim upon which relief can be granted as required by Fed.R.Civ.P. 12(b); that Agency lacks standing to proceed on the state law theory contained in Count II; and that Count II must be dismissed under principles of pendent jurisdiction. The Court's finding that plaintiff is not authorized by section 13(d) to bring this action makes it unnecessary for the Court to reach the other federal law issues raised by defendant. As to the state law claim contained in Count II, the Court agrees that dismissal is warranted under *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.") Inasmuch as there are involved here no extraordinary circumstances which suggest that judicial economy, convenience, and fairness to litigants would be disserved by dismissal of the pendent claim, the Court grants the motion to dismiss Count II as well.

6. In *Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court granted certiorari to decide the question of whether "a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under § 13(d)," thereby assuming the existence of standing. Indeed, the Court expressly stated that it was not required to decide "whether or under what circumstances a corporation could obtain a decree enjoining a shareholder who is currently in violation of § 13(d) from acquiring further shares, exercising voting rights, or launching a takeover bid, pending compliance with the reporting requirements." 422 U.S. at 59 n. 9, 95 S.Ct. at 2076. The Seventh Circuit in *Bath Industries, Inc. v. Blot,* 427 F.2d 97 (7th Cir. 1970), also assumed without deciding that a corporation could bring an injunctive action under section 13(d) to remedy a violation of that provision. *See also General Aircraft Corp. v. Lampert,* 556 F.2d 90, 94 n. 5 (1st Cir. 1977).

7. On the other hand, damage actions for violations of section 13(d) have been limited to suits brought by shareholders pursuant to section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a). Corporations have been denied standing to sue for damages. *See Myers v. American Leisure Time Enterprises, Inc.,* 402 F.Supp. 213, 214–215 (S.D.N.Y.1975).

*Polian Co.*, 466 F.Supp. 800, 802–803 (1979); *Grow Chemical Corp. v. Uran*, 316 F.Supp. 891, 892 (S.D.N.Y.1970). These decisions based their finding of a private right of action on the authority of *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, which the *Milstein* court characterized as "part of the ABC's of securities law." 453 F.2d at 719. In *Borak*, the Supreme Court relied on the broad remedial purposes of section 14(a) of the Exchange Act as well as the venue provision contained in section 27 to infer a private right of action for damages resulting from deceptive proxy solicitations. 377 U.S. 430–434, 84 S.Ct. at 1558–1560.

Recent Supreme Court decisions dealing with implied private rights of action, however, have abandoned the *Borak* approach. For example, in *Touche Ross & Co. v. Reddington*, 442 U.S. 560, 578–579, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979), the Court while declining to overturn *Borak*, clearly limited its precedential authority to the facts of that case:

> To the extent our analysis in today's decision differs from that of the Court in *Borak*, it suffices to say that in a series of cases since *Borak*, we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today.

*See also Cannon v. University of Chicago*, 441 U.S. 677, 690–692 n. 12, 99 S.Ct. 1946, 1954–1955, 60 L.Ed.2d 447 (1979) (*Borak* described as an unexplained deviation from the normal pattern of judicial implication of private rights of action). The decline of *Borak* renders less than compelling the authority of the above-cited cases finding an implied private right of action existent under section 13(d). Rather, it is in light of the evolving principles of construction that the Court must determine whether section

13(d) impliedly creates a private right of action for injunctive relief.[8]

As suggested in *Touche Ross*, the Supreme Court has developed more restrictive principles to govern the implication of private rights of action. Underlying the *Borak* view of implied private rights of action was the premise that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." 377 U.S. at 433, 84 S.Ct. at 1560. Implicit in this view was the assumption that if a private right of action would be consistent with the remedial purposes of section 14(a), then Congress clearly must have intended that such a right of action be available to aggrieved parties. The four-prong test for determining implied private rights of action set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), moved away from such heavy reliance on the desirability of creating private rights of action. True, two elements of the *Cort* inquiry—the consistency of a private right of action with the underlying purposes of the statute, and whether an implied right of action in federal court would impinge upon areas traditionally relegated to state law—continued to focus upon this consideration. However, the other two factors set forth in *Cort* —whether the statute creates a right in favor of the plaintiff, and whether there is any independent evidence of congressional intent to create an implied private right of action—required courts to undertake a more probing inquiry into whether Congress actually intended that there be such a right.

In its two most recent opinions in this area, the Supreme Court has gone farther and rejected any reliance upon the desirability of inferring a private right of action, either in terms of effectuating a statutory scheme or in terms of its effect on consider-

---

**8.** Plaintiff seeks to distinguish *Transamerica* and *Touche Ross* on the ground that these cases dealt with attempts to infer private rights of action for damages in statutory schemes other than section 13(d). However, the analysis used by the Court in these opinions clearly did not turn on such narrow distinctions. Plaintiff, of course, is correct when it points out

that *Transamerica* and *Touche Ross*, are not dispositive of the standing issues raised herein. Nonetheless, these recent Supreme Court precedents do set forth the principles under which this Court must assess the availability of a private right of action for injunctive relief under section 13(d).

ations of state-federal comity. In *Touche Ross*, the Supreme Court could find no evidence of congressional intent to create a private right of action under section 17(a) of the Exchange Act. Having so determined, the Court was unwilling to consider the "remedial purposes" of the Exchange Act sufficient reason to construe section 17(a) "more broadly than its language and the statutory scheme reasonably permit." 442 U.S. at 578, 99 S.Ct. at 2490. The Court concluded that "[t]he ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Id.*

Similarly, the Supreme Court in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1980), eschewed any reliance on the desirability of inferring a private right of action. At the outset, the Court observed:

> The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction. [Cites omitted]. While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, *e. g., J. I. Case v. Borak, supra*, what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear. [Cites omitted]. We accept this as the appropriate inquiry to be made in resolving the issues presented by the case before us.

100 S.Ct. at 245. In *Transamerica*, the Court found that section 215 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–15, gave rise to a private right of action for equitable relief, but that section 206 of the same Act, 15 U.S.C. § 80b–6, did not create a private damage action. In

reaching these results, the Court looked solely to congressional intent as expressed by the statutory language and legislative history; the statutory scheme of enforcement; and the creation of a class of specially benefitted persons under these sanctions. In denying a right of action under section 206, the Court once again declined to consider the desirability of creating such a right. "The dispositive question remains whether Congress intended to create any such remedy. Having answered that question in the negative, our inquiry is at an end." *Id.* 100 S.Ct. at 249.

As this Court has observed elsewhere, this more conservative approach to the implication of private rights of action stems in part from the Supreme Court's dissatisfaction with the willingness of the federal courts to infer private rights of action in a number of statutory schemes. *Cannon v. University of Chicago*, 441 U.S. 677, 741–742, 99 S.Ct. 1946, 1980–1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting).[9] By declining to consider the desirability of implying a private right of action, a factor which only tangentially bears upon the question of congressional intent, *Transamerica* and *Touche Ross* require this Court to focus upon the critical issue of statutory construction: whether Congress intended that corporations have standing to bring injunctive actions, either on their own behalf or on behalf of their shareholders, to remedy violations of section 13(d). In resolving this issue, the Court first will examine the statutory scheme of enforcement under the Exchange Act. This will be followed by an analysis of the statutory language and legislative history to determine whether the corporation is within the class of persons specially benefitted by section 13(d), and whether there is support for the proposition that Congress intended that a private right of action exist.

---

**9.** In *Stone v. Saxon & Windsor Group Ltd.*, 485 F.Supp. 1212 at 1218 (N.D.Ill.1980), this Court also noted that evolving rules for implying private rights of action reflected the view that an over-eagerness to infer private rights of action encouraged Congress to shirk its constitutional

obligation and leave these sometimes controversial issues to be resolved by courts on an ad hoc basis. *See e. g. Transamerica*, 100 S.Ct. at 249 (Powell, J., concurring); *Cannon*, 441 U.S. at 743–748, 99 S.Ct. at 1981–1984 (Powell, J., dissenting).

## A. Standing of the Corporation *Qua* Corporation

The Exchange Act provides several express methods of enforcing the provisions of section 13(d). Section 21 of the Act, 15 U.S.C. § 78u, authorizes the Securities and Exchange Commission ("SEC") to investigate possible violations of any provision—including section 13(d)—of the Exchange Act. If the SEC determines that a violation has occurred or is about to occur, it may file suit in the appropriate United States District Court for an injunction or a writ of mandamus. Section 21(d), (e). In addition, the SEC may forward any evidence of a violation to the Attorney General, who in his discretion may institute a criminal proceeding against the offending party. Section 21(d).

Section 18(a) of the Act, 15 U.S.C. § 78r(a), provides that purchasers and sellers of shares who rely on any false or misleading material statement made in the course of a filing required under the Exchange Act may file an action for damages. Significantly, it is this section which has been construed as providing the sole basis for a private right of action for damages resulting from a violation of section 13(d). *Myers v. American Leisure Time Enterprises, Inc.*, 402 F.Supp. 213, 214–215 (S.D.N.Y. 1975). Indeed, the Court in *Touche Ross*, while declining to decide the issue conclusively, observed that "[t]here is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the Commission . . ." 442 U.S. at 574, 99 S.Ct. at 2488.

The Court also notes that there are several other provisions of the Exchange Act which provide expressly for private rights of action. *See* § 9(e), 15 U.S.C. § 78i(e); § 16(b), 15 U.S.C. § 78p(b). Thus, it is of significance that section 13(d) fails to so provide. *Transamerica*, 100 S.Ct. at 248; *Touche Ross*, 442 U.S. at 572, 99 S.Ct. at 2487.

■ "It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica*, 100 S.Ct. at 247. The detailed enforcement scheme set forth in the Exchange Act clearly indicates that Congress directed its attention to the manner in which the Act's provisions would be enforced. Therefore, it is unlikely that Congress simply "absentmindedly forgot" to mention an intended private right of action for injunctive relief under section 13(d). *See Transamerica, id.*

This conclusion is supported by an examination of the statutory language and legislative history of section 13(d). The terms of section 13(d) do not create any rights on the part of issuing corporations such as Gateway. Rather, section 13(d) imposes upon holders of five percent or more of corporation's shares a duty to provide the SEC with certain information "as necessary or appropriate in the public interest or for the *protection of investors.*" (Emphasis supplied). The legislative history is to the same effect. Early drafts of the Williams Act, of which section 13(d) is a part, reflected hostility to attempted takeovers and thus might be said to have benefitted the issuing corporation. *See e.g.* 113 Cong.Rec. 857–858 (1967) (comments of Senator Kuchel); Note, *The Williams Amendments: An Evaluation of the Early Returns*, 23 Vand.L.Rev. 700, 700–701 (1970). In its final form, however, the Williams Act

avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case.

H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News pp. 2811, 2813. Thus, the Supreme Court in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977), found the legislative history of the Williams Act indicates that

its sole purpose was the protection of investors.[10]

Finally, neither the terms of section 13(d) nor its legislative history suggests the existence of a private right of action. Section 13(d) does not by its terms create or alter civil liability; rather, it simply requires certain conduct. Thus, it is similar to section 17(a), which the Court in *Touche Ross* noted requires only that certain records be kept and reports be filed, as well as to section 206 of the Investment Advisers Act, which the Court in *Transamerica* found to merely proscribe certain conduct. This is to be distinguished from a provision such as section 215 of the Investment Advisers Act, which renders void contracts made in violation of the Act. In *Transamerica*, the Court noted that "[b]y declaring certain contracts void, § 215 by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere." 100 S.Ct. at 246. The Court considered this to be evidence of congressional intent that parties have recourse to federal court to sue for rescission of the contract or to enjoin its continued enforcement. A like intent to authorize federal injunctive actions by corporations cannot be gleaned from the language of section 13(d).

Nor does the legislative history suggest that Congress wished to provide such a right of action; for all intents and purposes, the legislative history is silent on this issue.[11] As the Court observed in *Touche Ross*,

> implying a private right of action on the basis of congressional silence is a hazardous enterprise, at best. [Cites omitted]. And where, as here, the plain language of the provision weighs against implication of a private remedy, the fact that there is no suggestion whatsoever in the legislative history that § 17(a) may give rise to suits for damages reinforces our decision not to find such a right of action implicit within the section.

442 U.S. at 571, 99 S.Ct. at 2486. This reasoning applies with equal force to the situation herein.

Based on the foregoing analysis, the Court concludes that section 13(d) cannot be fairly read to imply a private right of action for injunctive relief on behalf of issuing corporations such as Gateway.[12] Whether this section gives rise to injunctive actions for the benefit of shareholders is a closer question.

10. This conclusion has been criticized on the ground that the interest of shareholders may not be so easily distinguished from those of the corporations whose shares they possess. *See The Supreme Court, 1976 Term*, 91 Harv.L.Rev. 1, 281–282 (1977). Nonetheless, the Supreme Court has not retreated from this view of the purposes underlying passage of the Williams Act.

11. In the House Report, it was noted that the SEC believed that the Williams Act would add little, if any, to the cost of administering the securities laws. H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2811, 2817. This statement might be construed as suggesting that the burden of enforcement would be borne by private parties rather than by the government. Standing alone, however, the Court does not believe that so much can be read into this single statement. This is particularly so since the statement represents the SEC, rather than congressional, view of the cost of enforcement. *Compare Piper*, 430 U.S. 1, 41 n. 27, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (Supreme Court declines to accord deference to SEC view that a right of action for damages should be implied

under section 14(e) for defeated tender offerors).

12. The Court finds further support for this conclusion in the legal maxim that "civil liability is implied from violation of a legislative enactment only when the injury claimed has been caused by that violation." *In Re Penn Central Securities Litigation*, 347 F.Supp. 1327, 1339 (E.D.Pa.1972), *aff'd*, 494 F.2d 528 (3d Cir. 1974). In this case, Gateway argues that it has been harmed in that there is uncertainty as to the future of the present management, and that Agency's continued acquisition of shares might result in the delisting of Gateway. This harm, however, would continue to exist even if the alleged violations of section 13(d) were rectified. So long as Agency continues, in Gateway's eyes, to have designs on gaining corporate control, the fate of present management will be uncertain. Similarly, the delisting of Gateway will remain a possibility so long as Agency continues to acquire shares, irrespective of what is contained in the 13D statement. Thus, implication of a right of action on behalf of the corporation would be ineffective in remedying the harm alleged herein.

### B. Standing of the Corporation of Sue of Behalf of its Shareholders

Insofar as Gateway seeks to maintain this action for the benefit of its shareholders, it can do so only to the extent that a shareholder could bring a private action for injunctive relief. Thus, the Court at the outset must determine whether section 13(d) impliedly creates a private right of action for shareholders to obtain injunctive relief.

As previously discussed, the Exchange Act provides several express methods for enforcing the provisions of section 13(d). The SEC may seek equitable relief for violations of section 13(d) pursuant to section 21(d), (e); the Attorney General may prosecute persons for violations of section 13(d) pursuant to section 21(d); and private parties may seek damages for violations of section 13(d) if they meet the requirements of section 18(a).[13] This enforcement scheme, as well as the other express remedial provisions contained in the Exchange Act, militates against implication of an additional right of action to enforce section 13(d).

■ On the other hand, it is clear from the statutory language and legislative history that shareholders are the intended beneficiaries of the disclosure requirements of section 13(d). The statute itself requires disclosure as necessary for the "protection of investors." In addition, the legislative history of the Williams Act singles out investors as the class of persons Congress intended to protect by passage of section 13(d); this much the Supreme Court recognized in *Piper*. This same statutory language and legislative history, however, fails to suggest the existence of a private right of action for injunctive relief. As mentioned earlier, section 13(d) merely requires that certain disclosures be made. It does not by its terms create or alter civil liability, such that a private right of action would be implicit therein. Moreover, the legislative history is silent as to any congressional intent to confer upon shareholders a private action for injunctive relief.

■ Thus, the Court is presented with a situation in which the statutory provision was enacted for the benefit of shareholders, and yet the statutory scheme of enforcement as well as the terms and legislative history of the provision weigh against implication of a private right of action for injunctive relief. Faced with a similar situation, the Supreme Court in *Transamerica*, declined to infer a private right of action with respect to section 206 of the Investment Adviser's Act, observing that "the mere fact that the statute was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their behalf." 100 S.Ct. at 249. That the plaintiff in *Transamerica* was a member of the class of persons especially benefitted by section 206 was considered insufficient to overcome the other factors militating against the existence of a private right of action.[14] On this reasoning, this Court as well declines to read into section 13(d) a private right of action on the part of shareholders for injunctive relief.

■ Moreover, even were this Court to find that section 13(d) impliedly grants shareholders a private right of action for injunctive relief, the Court would deny issuing corporations such as Gateway the standing to assert that right. The Second Circuit in *GAF v. Milstein*, 453 F.2d 709, 719–721 (2d Cir. 1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), reached a contrary result, largely on the ground that it considered issuing corporations best suited to the task of enforcing compliance with section 13(d). The *Milstein* court noted that the SEC was overburdened, and moreover

---

**13.** Although section 18(a) authorizes persons to seek damages "at law or *in equity* in any court of competent jurisdiction," plaintiff herein does not argue that section 18(a) empowers aggrieved parties to seek injunctive relief. If such a right exists, it does so by implication under section 13(d).

**14.** In *Cannon*, Justice Stevens had attempted to single out the "especially benefitted" factor as the "most accurate indicator of the propriety of implication of a cause of action." 441 U.S. at 690 n. 13, 99 S.Ct. at 1954. *Transamerica* evidently rejects this factor as a litmus test for implication of private rights of action.

that issuing corporations were in a better position to appraise the accuracy of statements made in Schedule 13D statements. The court also considered shareholder enforcement under section 18(a) inadequate, since once again the issuing corporation would be better able to assess the accuracy of Schedule 13D statements. In addition, the court observed that shareholders often do not have immediate access to these statements, and that "there may be instances where no shareholder has purchased or sold shares 'in reliance' on the statements." *Id.* at 721. The court noted that in the latter instance, shareholders would have little incentive to bring an enforcement action.

The Court believes that this latter conclusion underscores the basic flaw in the *Milstein* analysis. As discussed earlier, section 13(d) fails to confer upon issuing corporations a right to sue on their own behalf for injunctive relief. To the extent such corporations have standing under section 13(d), it must be derivative of the shareholders' right of action. It scarcely would further the goals of section 13(d) to permit an issuing corporation to sue on behalf of some unidentified group of shareholders who themselves may have no interest in pursuing an action. Indeed, as the court in *Milstein* acknowledged, permitting issuing corporations to maintain such actions well might give them a competitive advantage vis-a-vis takeover groups and thereby destroy the neutrality the Williams Act sought to achieve. This Court is unwilling to infer from section 13(d) standing for issuing corporations in the absence of any evidence of congressional intent to do so.

Thus, for all the foregoing reasons, the Court finds that the plaintiff Gateway may not maintain this action under section 13(d), either on its own behalf or for the benefit of its shareholders. It may be, as Gateway argues and the *Milstein* court concluded, that issuing corporations are the only ones that effectively can enforce compliance with section 13(d). In this regard, the Supreme Court's rejection of a similar argument in *Touche Ross* is instructive:

> But even if that were the case, the argument is made in the wrong forum, for we are not at liberty to legislate. If there is to be a federal damages remedy under these circumstances, Congress must provide it. "[I]t is not for us to fill any *hiatus* Congress has left in this area." [Cite omitted]. Obviously, nothing we have said prevents Congress from creating a private right of action on behalf of brokerage firm customers for losses arising from misstatements contained in § 17(a) reports. But if Congress intends those customers to have such a federal right of action, it is well aware of how it may effectuate that intent.

442 U.S. 579, 99 S.Ct. at 2490. If Congress deems a private right of action for injunctive relief necessary or desirable, it of course may provide for one expressly.[15] As matters now stand, however, Congress has provided a scheme of enforcement for section 13(d) that does not include such a right of action. Accordingly, defendant's motion to dismiss is granted. It is so ordered.

---

**15.** It has been suggested that because the past liberality with which the federal courts implied private rights of action no doubt encouraged Congress to leave that issue for judicial resolution, it is somewhat unfair now to refuse to imply private rights of action in the absence of strong evidence of congressional intent to provide for such an action. *Transamerica*, 100 S.Ct. at 253 n. 8 (White, J., dissenting); *Cannon*, 441 U.S. at 718, 99 S.Ct. at 1968 (Rehnquist, J., concurring). As is evident from *Transamerica*, however, a majority of the Supreme Court does not consider this a compelling reason to continue to liberally infer private rights of action. This is particularly so in light of Congress' ability to amend a statutory scheme to provide for such a right if it so chooses.