# INDIANA NATIONAL CORPORATION

### v.

### Martin D. RICH, et al.

### No. IP 82–1622–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 30, 1982.

STECKLER, District Judge.

This case is before the Court on defendants' Fed.R.Civ.P. 12(b) motion to dismiss plaintiff's complaint which seeks to enjoin the defendants from violating Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d). The defendants advance two arguments for dismissing this complaint. First, they argue that the plaintiff lacks standing to sue since no private right of action exists in plaintiff's favor under Section 13(d). Second, even if the plaintiff has standing to sue, the defendants' subsequent actions have rendered the instant controversy moot.

### A. *Plaintiff's Complaint.*

The plaintiff, Indiana National Corporation ("Indiana National"), filed this action seeking injunctive and declaratory relief from the defendants' ("the Rich Group") continued acquisition of Indiana National's stock. The core of Indiana National's complaint is its allegation that the defendants formed the Rich Group with the avowed purpose of obtaining control of Indiana National. Further, it alleges that once the Rich Group purchased more than 5% of Indiana National's shares of common stock, this group failed to make a full and complete disclosure of its true intention to Indiana National and its shareholders by filing a false and misleading Schedule 13D in violation of Section 13(d), 15 U.S.C. § 78m(d),[1] ("Section 13(d)"). Specifically, Indiana National avers that the Rich Group made the following misrepresentations and

Barnes & Thornburg, Indianapolis, Ind., Simpson Thacher & Bartlett, New York City by James A. McDermott, Indianapolis, Ind., Ann E. Stanley, Roy L. Reardon, Barry R. Ostrager, New York City, for plaintiff.

McHale, Cook & Welch, Indianapolis, Ind., Friedman & Koven, Chicago, Ill. by William F. Welch, Stephen J. Dutton, Phillip A. Terry, Indianapolis, Ind., Steven L. Bashwiner, H. Nicholas Berberian, Howard D. Lieberman, Chicago, Ill., for defendants.

1. Section 13(d), 15 U.S.C. § 78m(d), states that:

"(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title [15 USC § 78 l], or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of this title [15 USC § 78 l(g)(2)(G)], or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940 [15 USC §§ 80a–1 et seq.], is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each ex-change where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the pur-

omissions in their Schedule 13D plus their Amendments 1 through 5 thereto.

First, the Rich Group failed to disclose that their true purpose in acquiring Indiana National's stock is to take control of it.

Second, the Rich Group misrepresented their true purpose in acquiring Indiana National's stock to be one of an investment, when, in fact, they intend to seek control of it.

Third, the Rich Group failed to disclose that the Board of Governors of the Federal Reserve System had rejected their application to acquire a different bank holding company because their financial and managerial resources were unsatisfactory, and further, that acquisition of Indiana National will require the Board's approval.

Fourth, the Rich Group failed to disclose the true source of the funds it is

pose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 3(a)(6) of this title [15 USC § 78c(a)(6)], if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such person may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

"(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

"(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such

syndicate or group shall be deemed a "person" for the purposes of this subsection.

"(4) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

"(5) The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant having such purpose or effect.

"(6) The provisions of this subsection shall not apply to—

(A) any acquisition or offer to acquire securities made or proposed to be made by means of a registration statement under the Securities Act of 1933 [15 USC §§ 77a et seq.];

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class;

(C) any acquisition of an equity security by the issuer of such security;

(D) any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection."

using to purchase Indiana National's stock.

Fifth, the Rich Group failed to disclose the identities of its members and the amount of shares held by each member.

The Rich Group began acquiring shares of the common stock of Indiana National some time in 1981. About September 4, 1981, a group comprised of Rich Investments, Inc., Norman and Martin D. Rich, plus Herbert M. Spector, filed a Schedule 13D with the Securities and Exchange Commission (SEC) as required by Section 13(d)(1), 15 U.S.C. § 78m(d)(1). These four investors reported in this Schedule 13D that they had acquired 254,400 shares of Indiana National's common stock, no par value, which shares constituted approximately 5.14% of its then outstanding shares of common stock. This group of four investors subsequently filed Amendments 1, 2, and 3, on October 23, 1981, December 28, 1981, and February 8, 1982, respectively. These three amendments reported that these original investors had purchased additional shares totaling (out of the then outstanding shares of common stock), respectively, 315,000 (6.37%), 368,000 (7.44%), and 416,000 (8.43%). These investors' stake in Indiana National increased to 424,000 shares (8.56% of the outstanding shares) according to a fourth amendment filed on March 11, 1982, which amendment also indicated that the original investing group had changed to consist of MR Investment Associates and NR Investment Associates (each of which was composed of former shareholders of Rich Investments, Inc., which had been liquidated), plus Norman Rich, Martin D. Rich, and Herbert M. Spector. As indicated by the fifth amendment filed on May 17, 1982, this latter group, minus Spector, had increased its beneficial ownership of shares of plaintiff's common stock to 445,000 shares (8.89% of the outstanding stock). Finally, on August 10, 1982, a sixth amendment was filed by the same group which filed the March 11, 1982 fourth amendment. In the sixth amendment the "Rich Group" states that its investment in Indiana National consisted of 487,000 shares of 9.7% of the corporation's outstanding shares.

B. *Standing To Sue Under Section 13(d).*

The issue presently under consideration has been decided within this District. In *Dynamics Corp. of America v. Simcox,* No. IP 80–1067–C (S.D.Ind. Jan. 20, 1981) (order denying corporation defendant's Rule 12(b)(6) motion to dismiss for lack of standing under Section 13(d)), the Court, the Honorable James E. Noland presiding, held that a private right of action under Section 13(d) is held by the corporation issuing the shares of stock. In this case Dynamics Corporation of America (Dynamics) sued the Indiana Secretary of State and the CTS Corporation (CTS) challenging the constitutionality of the Indiana takeover law. CTS counterclaimed against Dynamics alleging it violated various federal statutes and regulations pertaining to securities transactions and anti-competitive practices. Further, CTS sought injunctive relief to prevent violations of Sections 13(d), 14(d), and 14(e) of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78m(d), 78n(d), and 78n(e), respectively. Dynamics moved for a Rule 12(b)(6) dismissal of CTS's counterclaim arguing that CTS lacked standing to assert a claim for injunctive relief under Section 13(d).

The *Dynamics Corp.* court acknowledged that two District Courts within the Seventh Circuit have held there is no private right of action under Section 13(d). *See, Gateway Indus., Inc. v. Agency Rent A Car, Inc.,* 495 F.Supp. 92 (N.D.Ill.1980) (J. Aspen presiding); *Sta-Rite Indus., Inc. v. Nortek, Inc.,* 494 F.Supp. 358 (E.D.Wis.1980) (J. Evans presiding). However, the holding and rationale of these two cases were rejected; instead, reliance was placed upon two different cases which held there is a private right of action under Section 13(d). *See, Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d 1216 (4th Cir.1980); *Kirsch Co. v. Bliss & Laughlin Indus., Inc.,* 495 F.Supp. 488 (W.D. Mich.1980). Significantly, the *Dynamics Corp.* opinion neither contains a discussion of the divergent analyses of these two interpretations of Section 13(d), nor is there

any reason stated for selecting the *Dan River* analysis over the *Gateway Indus.* analysis.

■ The discretionary doctrine of intra-court comity admittedly dictates that, as a general rule, judges of coordinate jurisdiction should follow brethren judges' rulings on identical issues. Nevertheless, this doctrine is not to be applied blindly in the presence of unusual or exceptional circumstances, which, after due consideration of the prior opinion, lead this Court to a different conclusion. In such a situation this doctrine must give way to the Court ruling in accordance with its own legal judgment. *United States v. Anaya,* 509 F.Supp. 289, 294–295 (S.D.Fla.1981); *Buna v. Pacific Far East Line, Inc.,* 441 F.Supp. 1360, 1365 (N.D.Cal.1976); *White v. Baltic Conveyor Co.,* 209 F.Supp. 716, 722 (D.N.J.1962). Because the *Dynamics Corp.* opinion does not analyze the competing policies set forth in the opposing decisions and, further, since it does not state any rationale for adopting the *Dan River* analysis over the *Gateway Indus.* analysis, the intra-court comity doctrine cannot control this Court's resolution of the present Rule 12(b)(6) motion. Consequently, the question whether Section 13(d) creates a private right of action in an issuing or target corporation must be considered anew by this Court.

1. The *Dan River* analysis.

In *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d 1216 (4th Cir.1980), the plaintiff ("Dan River") sued the defendant ("Unitex") pursuant to Section 13(d) for Unitex's failure to file a Schedule 13D as required upon purchasing 5% of Dan River's outstanding shares of stock. Initially, the District Court temporarily restrained Unitex from further purchases of Dan River's stock; but, after conducting a hearing on Dan River's preliminary injunction request, it denied this request and vacated its earlier temporary restraining order. Subsequently, the Court dismissed Dan River's action on jurisdictional grounds stating that the issuing corporation lacked standing under Section 13(d) to sue Unitex for filing a false or misleading Schedule 13D because Section 13(d) " 'was intended [simply as a disclosure Act] ... for the benefit of investors and not management' and was not to be used 'as a tool for management to preserve their offices.' " *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d at 1221 (quoting the District Court's opinion).

On appeal, the Fourth Circuit reversed, holding that an issuing or target corporation had standing to seek equitable relief under Section 13(d), 15 U.S.C. § 78m(d). The appellate court viewed the two cases on which the District Court had premised its dismissal, *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) and *Piper v. Chris-Craft Indus.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), as distinguishable from the *Dan River* facts. It characterized *Piper* as "an action at law by a disappointed tender offeror to recover damages for an alleged violation of § 14(e) of the Securities and Exchange Act of 1934." *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d at 1222. The *Dan River* court emphasized the Supreme Court's caution in *Piper* that " 'the target corporation's standing to sue [is not] in issue in [*Piper*]." *Id.* (quoting *Piper v. Chris-Craft Indus.,* 430 U.S. at 42, n. 28, 97 S.Ct. at 949, n. 28).

The Fourth Circuit summarized *Rondeau* as involving a target corporation's attempt to enjoin a defendant corporation which had been tardy in filing its Schedule 13D. Upon appealing to the Supreme Court, the target corporation sought to raise the issue whether the defendant's Schedule 13D statements were accurate and truthful; but, the Supreme Court refused to consider this issue. *Id.* (characterizing the opinion in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. at 61–62, n. 11, 95 S.Ct. at 2077–2078, n. 11). Rather, the *Rondeau* court limited "the case before it [to] 'only the availability of injunctive relief to remedy a § 13(d) violation following compliance'." *Id.* (quoting *Rondeau,* 422 U.S. at 59, n. 9, 95 S.Ct. at 2076, n. 9). Additionally, *Rondeau* definitely did not decide " 'whether or under what circumstances a corporation could obtain a decree enjoining a shareholder who is currently in

violation of § 13(d) from acquiring further shares, exercising voting rights; or launching a takeover bid, pending compliance with the reporting requirements.'" *Id.* (quoting *Rondeau,* 422 U.S. at 59, n. 9, 95 S.Ct. at 2076, n. 9).

Having distinguished the twin supports for the District Court's dismissal, the Fourth Circuit proceeded to recite and summarize a series of cases consistent with its holding that Dan River had a right to seek equitable relief for the filing of an allegedly false and misleading Schedule 13D. The Court primarily relied upon *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); in fact, it cited *GAF Corp. v. Milstein* "as the landmark authority on ... 'whether [the target corporation] has standing under section 13(d) to seek an injunction against allegedly false and misleading filings.'" *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d at 1222–1223 (quoting *GAF Corp. v. Milstein,* 453 F.2d at 720). *GAF Corp. v. Milstein* stated that the obligation under Section 13(d) is to file a *truthful* Schedule 13D and, absent such a filing "the issuer [target corporation] has standing under section 13(d) to seek relief in the event of a false filing." *Id.,* 453 F.2d at 720. (Original emphasis.) Because the Supreme Court refused to address either the standing or jurisdiction issue in both *Piper* and *Rondeau,* plus since *GAF Corp. v. Milstein* continued to control the question, the Fourth Circuit held that an issuing or target corporation possesses a private right of action under Section 13(d) to seek an injunction against an investor holding 5% or more of its shares of stock who files a Schedule 13D which is inaccurate, incomplete or misleading. In such a situation the aggrieved corporation could seek equitable relief requiring the investor to file "an amended Schedule 13D complying with the requirement of a truthful and complete statement as contemplated under [Section 13(d)]." *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d at 1224.

2. The *Gateway Indus.* analysis.

In *Gateway Indus., Inc. v. Agency Rent A Car, Inc.,* 495 F.Supp. 92 (N.D.Ill.1980), the plaintiff ("Gateway") brought suit under Section 13(d) to obtain equitable relief from the defendant's ("Agency") alleged failure to file an accurate Schedule 13D. The District Court commenced its opinion with a discussion of the standing issue which it acknowledged had not been addressed in either the Supreme Court or the Seventh Circuit Court of Appeals; nonetheless, it recognized that "the decisional authority unanimously has upheld the existence of a private right of action for injunctive relief under section 13(d)." *Id.,* 495 F.Supp. at 95 (citing *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d at 1216; *GAF Corp. v. Milstein,* 453 F.2d at 709; *Wellman v. Dickinson,* 475 F.Supp. 783, 817 (S.D.N.Y.1979); *W.A. Krueger Co. v. Kirkpatrick, Pettis, Smith, Polian, Inc.,* 466 F.Supp. 800, 802–803 (S.D.N.Y.1979); *Grow Chem. Corp. v. Uran,* 316 F.Supp. 891, 892 (S.D.N.Y.1970)).

The Court initiated its analysis of the standing issue by recognizing *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), as the basis for the general rule of standing under Section 13(d) wherein the Supreme Court inferred a private right of action for damages resulting from deceptive proxy solicitations. But, the *Gateway Indus.* Court refused to rely on *J.I. Case v. Borak, supra,* as the court interpreted "[r]ecent Supreme Court decisions dealing with implied rights of action [as] hav[ing] abandoned the *Borak* approach." *Gateway Indus., Inc. v. Agency Rent A Car, Inc.,* 495 F.Supp. at 96 (citing *Transamerica Mtg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1980) and *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)). Rather, these two cases were read to require the trial court "to focus upon the critical issue of statutory construction: whether Congress intended that corporations have standing to bring injunctive actions, either on their own behalf or on behalf of their shareholders, to remedy violations of section 13(d)." *Id.,* 495 F.Supp. at 97. Following the perceived instructions of these two cases, the *Gateway Indus.* Court

construed the congressional intent in accordance with the four-part test delineated in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). This *Cort* test led the Court to examine the statutory language and the legislative history of the Williams Act, of which Section 13(d) was a part, plus this test caused the Court to review the overall framework of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* The Court's analysis led it to conclude that Congress did not intend to create in Section 13(d) a private right of action; therefore, the Court held that Section 13(d) could not "be fairly read to imply a private right of action for injunctive relief on behalf of issuing [or target] corporations such as Gateway." *Gateway Indus., Inc. v. Agency Rent A Car,* 495 F.Supp. at 99.

3. *Cort v. Ash.*

The precise issue before the Court must be analyzed against a background of long standing, but varying, judicial formulations of the circumstances out of which a private cause of action can be implied. The Supreme Court's decision in *Cort v. Ash,* 422 U.S. at 66, 95 S.Ct. at 2080, sets forth the current formula. In *Cort* the Court refused to imply a private cause of action for damages against corporate directors in favor of shareholders for alleged violations of a criminal statute prohibiting the corporation from making certain campaign contributions. Justice Brennan, writing for a unanimous Court, outlined a four-part test for implying a private statutory cause of action.

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . . (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it

would be inappropriate to infer a cause of action based solely on federal law? . . . ." *Id.,* 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted). Combined into one equation, these four factors constitute the pertinent questions to answer in determining whether an implied, private cause of action exists under Section 13(d).

Prior to analyzing the facts of this case through the focal point of the *Cort* test, it is important to note that while the *Cort* test is more restrictive than its principal predecessor, *J.I. Case Co. v. Borak,* 377 U.S. 426, 432–33, 84 S.Ct. 1555, 1559–1560, 12 L.Ed.2d 423 (1964), recent cases evince a further retreat from the *Borak* line of cases which readily implied statutory, private causes of action. *E.g., Touche, Ross & Co. v. Redington,* 442 U.S. 560, 568–74, 99 S.Ct. 2479, 2485–2488, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20–24, 100 S.Ct. 242, 247–249, 62 L.Ed.2d 146 (1979). In denying private causes of action under Section 17(a), 15 U.S.C. § 78q(a), of the Securities Exchange Act of 1934, the *Touche Ross* Court placed special emphasis upon an examination of the language, legislative history and purpose of the statute because these three factors of the *Cort* test are the traditional indicia of legislative intent. Significantly, the Court held that if these three factors are absent, then the trial court need not investigate the fourth factor, *i.e.,* whether the proposed implied private right is a cause of action traditionally relegated to the states. The significance of this holding is that the Court for the first time in applying the *Cort* test indicated that the four factors are not to be given equal weight; rather, the critical question is whether Congress intended to create a private cause of action. *Touche Ross & Co. v. Redington,* 442 U.S. at 575–77, 99 S.Ct. at 2488–2489; *see also, Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (alluding to the possibility that these four factors might be of unequal weight).

Later in the 1979–80 term, the Supreme Court, through *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 11, 100

S.Ct. at 242, stayed the course it set in the *Cort* and *Touche Ross* opinions. In *Transamerica* the Court rejected a proposed implication of a private remedy under § 206 of the Investment Advisors Act of 1940, 15 U.S.C. § 80 b–6 (1976) ("§ 206"). The analytical premise for this rejection consisted of a basic statutory construction together with an examination of the Act's legislative history. In construing the language of § 206, the Supreme Court emphasized that other sections of this Act created criminal penalties, civil action by the SEC and other administrative sanctions. The Court's construction of § 206 within the framework of the Act led the Court to conclude that Congress would not establish a comprehensive enforcement scheme which fails to mention a private cause of action under § 206 if Congress truly intended to confer such a private action. Further, the absence within the Act's legislative history of an indication Congress implied the proposed private cause of action reinforced the Court's conclusion that no such cause could be implied. However, the true relevance of *Transamerica* is that because the *Cort*-inspired inquiry failed to uncover any statutory or legislative history to support an implication of a private remedy, as in *Touche Ross,* the application of the *Cort* test need not proceed to the fourth step. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 20–24, 100 S.Ct. at 247–249.

One final consideration must be addressed prior to deciding whether to utilize the *Cort* test to resolve the issue presently before this Court. In *Kirsch Co. v. Bliss & Laughlin Indus., Inc.,* 495 F.Supp. at 488, the Court criticized the reliance upon the *Touche Ross* and *Transamerica* opinions by the *Gateway Indus.* Court because: "(1) the[se] cases involve damages rather than injunctive relief; and (2) there was no public interest requiring full and truthful disclosure." *Id.,* 495 F.Supp. at 491. The former criticism appears to be unfounded for two reasons. First, neither in *Touche Ross,* nor in *Transamerica,* did the Supreme Court draw this distinction even though it was readily apparent to the Court. Second, this distinction is inaccurate considering the re-medial posture of the relevant cases. The seminal *Borak* case involved a request for both legal and equitable remedies. But, the *Touche Ross* plaintiff prayed only for legal relief, while both the *Cannon* and *Transamerica* plaintiffs sued solely for injunctive relief. The latter criticism also evaporates after scrutinizing the *Touche Ross* and *Transamerica* opinions because in both cases the Supreme Court emphasized the elaborate enforcement mechanisms of § 17(a), 15 U.S.C. § 78q(a) and § 206, 15 U.S.C. § 80 b–6, as evidence of the public's interest. This Court's full consideration of these criticisms, plus its interpretation of the impact of *Touche Ross* and *Transamerica* upon the *Cort v. Ash* test, convinces it that the *Cort* test, rather than the *J.I. Case v. Borak* or *GAF Corp. v. Milstein* opinions, control the determination whether Indiana National possesses a private cause of action under Section 13(d) thereby conferring standing upon it to seek an injunction against the continued acquisition of its stock by the Rich Group. Accordingly, the Court's analysis must now apply the *Cort* test to the present case.

4. Application of the *Cort* test.

■■■ The language of Section 13(d) does not create any rights for the issuing or target corporation. Instead, it requires shareholders of 5% or more of the corporation's shares to provide the SEC with certain information "as necessary or appropriate in the public interest or for *the protection of investors* ...." *Id.,* 15 U.S.C. § 78m(d) (emphasis supplied). The legislative history supports this view as the early drafts of the Williams Act, of which Section 13(d) is a portion, sought to curb corporate takeovers and, thus, indirectly benefitted the target corporation. *See,* 113 Cong.Rec. 857–858 (1967) (Senator Kuchel's comments); Note, *The Williams Amendments: An Evaluation of the Early Returns,* 23 Vand.L.Rev. 700, 700–701 (1970). But, in its final form the Williams Act avoided favoring either the target management or acquisitor corporation; rather, Congress designed the Act "to require full and fair

disclosure for the benefit of investors while at the same time providng the offeror and management equal opportunity to fairly present their case." H.R.Rep. No. 1711, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2811, 2813. Further, the Supreme Court has characterized this same legislative history as being indicative of the Act's sole purpose—the protection of the investor. *Piper v. Chris-Craft Indus., Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Consequently, it is apparent that it is investors, not an issuing or target corporation, " 'for whose *especial* benefit [Section 13(d)] was enacted,' ... (emphasis supplied) ...." *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087 (citations omitted).

An investigation seeking to discover any legislative intent to create a Section 13(d) private cause of action must begin with an examination of the enforcement mechanisms created by the statute. The Securities Exchange Act of 1934 includes several express methods of enforcing the disclosure requirements of Section 13(d). Section 18(a), 15 U.S.C. § 78r(a), allows parties who rely on any false or misleading material statement made in the course of any filing required under the Act, to prosecute an action for damages. As an aside, this Court recognizes the *Touche Ross* Court's observation in dictum that "[t]here is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the [SEC], ...." *Touche Ross & Co. v. Redington,* 442 U.S. at 573, 99 S.Ct. at 2487. Recognition must also be given to Section 21 of the Act, 15 U.S.C. § 78u, which empowers the SEC to investigate possible violations of any of the Act's provisions including Section 13(d). In turn the SEC can pursue two avenues of action if it determines that a violation has occurred or is about to occur. First, the SEC may seek an injunction or a writ of mandamus in the proper United States District Court. Second, it may forward any evidence it uncovers to the Attorney General who may then make the discretionary decision whether to institute criminal proceedings against the alleged violator. This detailed enforcement mechanism, which Congress embodied in the Act, makes it unlikely that Congress failed to expressly provide a private cause of action within Section 13(d) if that was its intent. Accordingly, the second *Cort* factor also weighs against the plaintiff's position. *See, Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 20, 100 S.Ct. at 247.

Acknowledging that the underlying purpose of Section 13(d) is to protect the investor, the application of the *Cort* test next turns to an examination of other provisions of the Act which expressly provide for a private cause of action. Section 9, 15 U.S.C. § 78i, outlaws the manipulation of securities prices on the national securities exchanges. Section 78i(e) specifically creates a private cause of action in favor of any person who purchases or sells a security, the price of which has been affected by the type of manipulative practices proscribed by § 78i, by allowing the aggrieved investor to recover damages from any person who willfully participates in the manipulative practice. *Surowitz v. Hilton Hotels Corp.,* 342 F.2d 596 (7th Cir.1965), *rev'd on other grounds,* 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966). Similarly, Section 16, 15 U.S.C. § 78p, prevents the unfair use of information which may have been obtained by an insider through his relationship with a corporation, thereby protecting the investing public from corporate insiders who trade in stock on the basis of information unavailable to the public. *Kern Cty. Land Co. v. Occidental Petro. Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

It should be noted that besides the above private remedies created by the Act, other sections of the securities laws provide for criminal penalties, civil action by the SEC, and other administrative sanctions. First, 15 U.S.C. § 80 b–17, makes willful violations of the Investment Advisors Act criminal offenses which are punishable by fine or imprisonment, or both. Second, as previously suggested, 15 U.S.C. § 80 b–9 authorizes the SEC to bring civil suits in federal courts to enjoin noncompliance with this

Act. Finally, under 15 U.S.C. § 80 b-3, the SEC is authorized to impose various administrative sanctions on persons who violate the Act. "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 19, 99 S.Ct. at 246. Following this canon, plus the doctrine of *inclusio unios est exclusio alterius* ("the inclusion of one is the exclusion of another"), it is apparent that in view of the specific enforcement mechanisms created by Congress to detect and punish violations of the securities laws, with regard to Section 13(d), "it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.' *Cannon v. University of Chicago, supra,* [441 U.S.] at 742 [99 S.Ct. at 1981] (Powell, J., dissenting.)" *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. at 20, 99 S.Ct. at 247.

The above analysis crystallizes the point that neither the statutory language nor the legislative history of Section 13(d) support Indiana National's argument that Congress intended to imply a private cause of action within Section 13(d). Having failed to pass the first three steps of the *Cort* test, Indiana National's argument need not be put to the fourth step of this test. *Id.,* 444 U.S. at 23–24, 99 S.Ct. at 249. This failure to pass the *Cort* test leads this Court to conclude that Congress did not imply a private cause of action within Section 13(d) for the benefit of an issuing or target corporation. The Rich Group's argument that Indiana National fails to state a claim in its complaint need not be considered by this Court because, absent an implied private cause of action, Indiana National lacks standing to sue under Section 13(d).

In conformance with the above opinion, the Rich Group's Rule 12(b) motion to dismiss for lack of standing must be, and hereby is, GRANTED.

IT IS SO ORDERED.

## JUDGMENT

Pursuant to the Court's order of December 30, 1982, granting the defendants' Rule 12(b) motion to dismiss due to the plaintiff's lack of standing to sue,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that due to the plaintiff's lack of standing to sue, plaintiff shall take nothing, and that this action be DISMISSED with each party to bear its own costs and attorneys fees.