**POLAROID CORPORATION, Appellant,**

v.

**Roy E. DISNEY, Patricia A. Disney, Stanley P. Gold, Shamrock Holdings, Inc., Shamrock Holdings of California, Inc., Shamrock Capital Investors III, Inc., Emerald Isle Associates, L.P., Shamrock Acquisition III, Inc., Appellees.**

No. 88–3676.

United States Court of Appeals, Third Circuit.

Argued Oct. 27, 1988.

Decided Nov. 23, 1988.

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■

Paul C. Saunders (argued), Cravath, Swain & Moore, New York City, R. Franklin Balotti, Gregory V. Varallo, James C. Strum, Daniel A. Dreisbach, Richards, Layton & Finger, Wilmington, Del., O'Sullivan Graev & Karabel, New York City, for appellant.

Pamela Jarvis (argued), Fried, Frank, Harris, Shriver & Jacobson, New York City, A. Gilchrist Sparks, III, Lawrence A. Hamermesh, Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for appellees.

Before BECKER, HUTCHINSON and COWEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Polaroid Corporation ("Polaroid") from an order of the district court denying Polaroid's motion for a preliminary injunction against a tender offer for Polaroid stock which, if successful, would vest control of Polaroid in interests controlled by appellees Roy and Patricia Disney. The appeal presents the first impression question of the standing of a target company to assert a violation of the Security and Exchange Commission's All Holders Rule, 17 C.F.R. § 240.14d–10(a) (1987). It also raises the question whether

the Disney interests violated section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1982), by making misrepresentations concerning whether their tender offer complied with Federal Reserve Board margin regulations limiting the use of debt securities by shell corporations to finance corporate takeovers.

For the reasons that follow, we hold that Polaroid does not have standing to raise a claim under the All Holders Rule and will therefore affirm the district court's refusal to grant a preliminary injunction on the basis of Polaroid's All Holders Rule claim. We also hold, however, that Polaroid has demonstrated a reasonable probability of success on the merits of its section 14(e) misrepresentation claim; that Polaroid's shareholders will be irreparably harmed absent relief; and that Polaroid has otherwise met its burden of demonstrating the need for a preliminary injunction. We will therefore reverse the district court's refusal to grant injunctive relief on this basis and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

On September 9, 1988, Shamrock Acquisition III, Inc. ("Shamrock") commenced a $2.6 billion cash tender offer ("Offer") for all outstanding common shares of Polaroid at $42 per share, excluding shares held by Polaroid's Employee Stock Ownership Plan ("ESOP"). Shamrock, the acquisition entity, is wholly owned by Emerald Isle Associates, L.P. ("Emerald"). Emerald's general partner is Shamrock Capital Investors III, Inc., which is wholly owned by Shamrock Holdings of California, Inc., which is in turn wholly owned by Shamrock Holdings, Inc. Shamrock Holdings, Inc. is controlled by Roy E. Disney and Patricia A. Disney.

For our purposes, the critical facet of Shamrock's Offer is that it is expressly conditioned on satisfaction of several conditions, including that: (1) at least 90% of the outstanding shares be tendered, excluding the ESOP shares ("Minimum Condition"); and (2) the issuance of stock to the Polaroid ESOP be "invalidated or rescinded pursuant to a final judicial determination or the Purchaser [Shamrock] otherwise being satisfied that the ESOP Shares are not validly outstanding" ("ESOP Condition"). The Offer also states that if the ESOP Condition is not satisfied prior to the expiration of the Offer, or if Shamrock determines, in its sole discretion, that the ESOP Condition cannot timely be satisfied, Shamrock "currently intends to amend the Offer" so as to: (1) waive the ESOP Condition; (2) reduce the tender offer price to $40 per share; and (3) adjust the number of shares required to satisfy the Minimum Condition to take into account the additional ESOP shares.

While Shamrock maintains that the ESOP Shares are invalid, it has presented no evidence in this case to substantiate that claim. Rather, Shamrock rests on its description of a suit it filed against Polaroid in the Delaware Chancery Court on July 20, 1988. In that suit, Shamrock has alleged that the ESOP was adopted by Polaroid's directors

> in violation of their fiduciary duties to the company's public stockholders in that, among other things, (i) the ... ESOP was hastily adopted with the primary and improper purpose of entrenching incumbent management and without due consideration or investigation of the facts; and (ii) the ... ESOP was an unreasonable response to Shamrock's expressions of interest in meeting with Polaroid on a friendly basis.

Appellee's Brief at 8. The trial in that action began on October 19, 1988; scheduling difficulties have prevented its completion to date.

Polaroid brought the instant action for a preliminary injunction on September 20, 1988. Polaroid alleged, *inter alia*, that Shamrock's exclusion of the Polaroid ESOP shares from its tender offer violated the All Holders Rule, 17 C.F.R. § 240.14d–10(a), and that Shamrock's disclosure regarding its compliance with Federal Reserve Board margin regulations violated the anti-fraud provision of the Williams Act, section 14(e), 15 U.S.C.

§ 78n(e).[1] Named as defendants were Roy and Patricia Disney; Shamrock; Shamrock's president, Stanley P. Gold; Emerald; Shamrock Capital Investors III, Inc.; Shamrock Holdings of California, Inc.; and Shamrock Holdings, Inc. After expedited discovery and a hearing, the district court, for reasons set forth below, denied Polaroid's motion for a preliminary injunction. *Polaroid Corp. v. Disney*, 698 F.Supp. 1169 (D.Del.1988). Polaroid immediately appealed and moved for an injunction pending appeal. We reserved ruling on the motion and expedited the appeal, hearing argument on October 27, 1988.

Shamrock's Offer was originally set to expire on October 6, 1988, unless extended. On September 30, Shamrock extended its Offer until October 17. On October 14, after the District Court's decision, Shamrock further extended its Offer until October 27. On October 24, Shamrock again extended its Offer until November 7. And on October 31, Shamrock extended its Offer until November 17. In its October 31 press release, Shamrock stated its intentions as follows:

> The trial in the litigation brought by Shamrock against Polaroid in Delaware Chancery Court challenging Polaroid's recently adopted ESOP is scheduled to resume on Thursday, November 3, 1988, and the last trial date in that litigation is scheduled for Thursday, November 10. Accordingly, Shamrock intends to extend the offer at least until the Chancery Court renders a decision in that litigation.

On November 14, Shamrock further extended its Offer until November 28.

In reviewing the denial of a preliminary injunction, we must affirm the order of the district court "unless the court abused its discretion, committed an error of law, or seriously misjudged the evidence." *Eli Lilly & Co. v. Premo Pharmaceutical Laboratories, Inc.*, 630 F.2d 120, 136 (3d Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). The party seeking the preliminary injunction has the burden of showing

> (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... [W]hile the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*Id.* (quoting *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir.1978)).

Of the three issues that Polaroid presses on appeal, we confine our plenary discussion to the All Holders and misrepresentation issues.[2]

## II. ALL HOLDERS RULE

### A. Introduction

The All Holders Rule states that a bidder's tender offer must be open to "all security holders of the class of securities

---

1. In 1968, Congress enacted the Williams Amendments to the Securities and Exchange Act. These Amendments added § 13(d) to require disclosure of substantial acquisitions of equity securities, § 13(e) to regulate acquisitions of stock by the issuer, §§ 14(d) and 14(e) to regulate tender offers, and § 14(f) to regulate changes in the composition of the board of directors pursuant to substantial stock acquisitions or tender offers and without a meeting of the issuer's shareholders. *See* Pub.L. 90–439, §§ 2, 3, 82 Stat. 454, 455, July 29, 1968 (amending 15 U.S.C. §§ 78m, 78n). These provisions are referred to in this opinion as either Exchange Act or Williams Act provisions.

2. Polaroid also argues that the district court erred in failing to hold that Shamrock's financial advisors, Wertheim Schroder & Co. Inc. and Drexel Burnham Lambert Inc., were "bidders" for Polaroid, required to disclose "current, adequate financial information" of their "financial condition" if "material to a decision by a security holder ... whether to sell, tender or hold securities being sought in the tender offer." 17 C.F.R. § 240.14d, Schedule 14d–1, Item 9. We affirm the district court's refusal to grant relief on the ground that the financial advisors are not bidders on the authority of *City Capital Associates v. Interco Inc.*, 860 F.2d 60 (3d Cir.1988). The facts here are sufficiently similar to *Interco* to render it controlling.

subject to the tender offer." 17 C.F.R. § 240.14d–10(a). The SEC promulgated the Rule to ensure "fair and equal treatment of all holders of the class of securities that is the subject of a tender offer." Amendments to Tender Offer Rules: All–Holders and Best–Price, 51 Fed.Reg. 25,-873, 25,874 (July 17, 1986). The Rule was responsive to the situation which gave rise to the litigation in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 949 (Del. 1985), in which the Delaware Supreme Court upheld the power of a corporation to effect a self-tender for its shares which excluded shares of a minority shareholder who was attempting to take over the corporation.

Polaroid argues that Shamrock's tender offer violates the Rule because it is not open to all holders of Polaroid common stock; the Polaroid ESOP is a holder (of 9.7 million shares) of Polaroid common stock and Shamrock has not offered to purchase the ESOP shares. Shamrock's argument in response is that its tender offer is "premised on the invalidity of the ESOP shares." Appellee's Brief at 19. Polaroid responds by analyzing what Shamrock means by "invalidity."

The tender offer is expressly conditioned, *inter alia*, on the satisfaction of the ESOP condition. There are two parts to this condition. The first part assumes that the ESOP shares have been "invalidated or rescinded pursuant to a final judicial determination." If the first part is met, the ESOP Condition is satisfied and the tender offer may be closed. If it is not, Shamrock could still close the tender offer if the second part is satisfied. This second part allows Shamrock to close the tender offer as long as it is "otherwise ... satisfied that the ESOP Shares are not validly outstanding." Shamrock may thus close the tender offer without purchasing any of the ESOP shares simply by declaring that the ESOP shares are "not validly outstanding" even though no judicial determination, final or otherwise, has been made with respect to the validity of those shares. Polaroid therefore argues—and with great force— that to hold that a tender offer such as Shamrock's complies with the All Holders

Rule would permit the Rule to be evaded at will. A tender offeror would merely need to declare the invalidity of the shares that it did not wish to purchase and then proceed as if the All Holders Rule did not exist.

Shamrock's response is that it has done more than merely declare that the Polaroid ESOP shares are invalid. In addition, it has instituted a "massive litigation" to have the ESOP shares declared invalid, which has included "over 30 depositions and the production of some 60,000 pages of documents" and is currently in the midst of a multi-day trial.

The district court "assumed ... *arguendo* that Polaroid does have standing" to raise the issue but found no violation of the Rule. 698 F.Supp. at 1174. The court reasoned that "Shamrock should not be forced to make its offer to holders of ESOP shares, the issuance of which Shamrock is challenging in another action." *Id.* The court emphasized, however, that it was

> *not* holding ... that a tender offeror's mere good-faith belief as to the validity of shares controls, as a matter of law, the shares to which a tender offer must be made. Rather, the court holds that, *under the particular facts of this case*, Shamrock's exclusion of the ESOP shares in its original Offer was not inconsistent with the All Holders Rule given Shamrock's belief, as detailed in its Offer, that the ESOP shares were not validly issued. The particular circumstances to which the Court refers include, *inter alia*, the timing and scope of Polaroid's ESOP as well as the fact that Shamrock has sued to challenge the validity of the ESOP. Because of this belief on the part of Shamrock and its stated intention to amend its Offer to include the ESOP shares at $40 per share upon a judicial determination of the ESOP's validity, the Court does not deem this the type of situation that the All Holders Rule was designed to remedy.

*Id.* at 1174–75.

Polaroid maintains on appeal that the "particular circumstances" of this case can-

not cure the defect in Shamrock's offer, which gives Shamrock unfettered discretion to determine that the ESOP shares are invalid and close the tender offer without purchasing the ESOP shares. Polaroid emphasizes that: (1) the ESOP shares are presumed valid under Delaware law until a court determines otherwise; (2) the Offer's representation that Shamrock may amend the Offer to include the ESOP shares has no binding effect and cannot at any rate cure the Offer's violation of the All Holders Rule; and (3) if particular circumstances do justify an exception to the Rule, Shamrock should have applied to the SEC for a determination that compliance with the Rule is not "in the public interest" or "necessary ... for the protection of investors" pursuant to the exception written into the Rule, 17 C.F.R. § 240.14d–10(e).

We turn to the threshold question of Polaroid's standing to assert these claims.

## B. Standing of a Target Corporation to Raise a Claim Under the All Holders Rule

### 1. Methodology.

In considering the standing of Polaroid as a target corporation to assert a violation of the All Holders Rule, we are confronted with two strains of jurisprudence: the private right of action cases and the standing cases. Logically, the first resort is to the private right of action cases. If a private right of action exists in favor of a party, standing follows as a matter of course. As will be seen, with respect to shareholders of the target corporation, we conclude that a private right of action exists in their favor and, consequently, they have standing. As will also be seen, with respect to target corporations, the private right of action cases suggest that a target corporation does not have a private right of action because it is not one for whose "especial

benefit" the statute was enacted. *Piper v. Chris–Craft Industries, Inc.,* 430 U.S. 1, 35, 37, 97 S.Ct. 926, 947, 51 L.Ed.2d 124 (1977). In the context of the Williams Act, however, the Supreme Court has intimated that because of the strength of the evidence that Congress intended to create a private right of action, this conclusion as to "especial benefit" should be given less weight than is ordinarily appropriate with respect to the issue of who may sue. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 391 n. 92, 102 S.Ct. 1825, 1846 n. 92, 72 L.Ed.2d 182 (1982) (dictum). We thus also look to the cases that the Supreme Court has decided in the standing area, which have, on occasion, allowed a plaintiff to raise the rights of a third party under statutes that create an express right of action in favor of the third party.[3]

Neither the Williams Act nor the All Holders Rule expressly creates a private right of action to supplement the enforcement powers of the SEC. Furthermore, the only references in the legislative history to private rights of actions are two briefly stated suggestions that, in light of *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), which implied a private right of action under section 14(a) of the Exchange Act, courts are likely to allow private rights of action to enforce the Williams Act. These two statements occurred only in two commentators' written, uncommented upon submissions and are thus "entitled to little weight." *Chris–Craft,* 430 U.S. at 31 n. 20, 97 S.Ct. at 944 n. 20 (discussing the two commentators' references to *Borak* and quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976)); *see also* Pitt, *Standing to Sue Under the Williams Act After Chris–Craft: A Leaky Ship on Troubled*

---

**3.** While it might be objected that the standing cases that we consider were announced with respect to statutes with express rights of action, these cases do not appear to be based on any interpretation of the language of the statutory provisions that create the right of action but instead rest on principles of greater generality. While the question of who can sue, like the

question whether there is an implied right of action, is ultimately a question of statutory construction and thus one of divining the intent of Congress in passing the statute, the standing cases can be viewed as attempting to reflect the considerations that Congress would think important if it expressly addressed the question of who may sue.

*Waters,* 34 Bus.Law. 117, 142 n. 186 (1978) (quoting submissions in greater detail).

■ *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939 (3d Cir.), cert. denied, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985) explicates the methodology for making the private right of action determination. It requires that we first address three questions: (1) "whether the agency rule is properly within the scope of the enabling statute"; (2) "whether the statute under which the rule was promulgated properly permits the implication of a private right of action"; and (3) "whether implying a private right of action will further the purpose of the enabling statute." *Id.* at 947. If a private right of action is determined to exist, we must then decide the difficult question whether a target corporation has standing to bring injunctive relief to vindicate the rights of shareholders under the Rule. *Cf. Curran,* 456 U.S. at 388–95, 102 S.Ct. at 1844–48 (turning to standing issue only after determining that a private cause of action was available under Commodity Exchange Act in favor of some plaintiffs); Schneider, *Implying Private Rights and Remedies Under the Federal Securities Acts,* 62 N.C.L.Rev. 853, 882–84 (1984). We turn to the first of the three *Angelastro* questions.

## 2. Is the All Holders Rule properly within the scope of the Williams Act?

■ Section 14(e) of the Williams Act proscribes "fraudulent, deceptive, or manipulative acts ... in connection with any tender offer." 15 U.S.C. § 78n(e). A unanimous Court in *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985), held that section 14(e) does not prohibit manipulative conduct unless there has been some element of deception through a material misrepresentation or omission. The Court held that "[i]t is clear that Congress relied primarily on disclosure to implement the purpose of

the Williams Act" and characterized all of the Williams Act provisions as disclosure provisions. *Id.* at 8–9, 105 S.Ct. at 2463. *Schreiber* characterizes even section 14(d)(6), which mandates the proration of share purchases when the number of shares tendered exceeds the number of shares sought, and section 14(d)(7), which mandates the payment of the same price to all those whose shares are purchased, as "requir[ing] or prohibit[ing] certain acts so that investors will possess additional time within which to take advantage of the disclosed information." *Id.* at 9, 105 S.Ct. at 2463. It is thus possible to read *Schreiber* to imply that the All Holders Rule is beyond the SEC's authority under the Williams Act, for the Rule's purpose seems to be neither to ensure full disclosure nor to provide for an adequate time period for investors to comprehend disclosed information.[4]

Although *Schreiber* categorizes the proration and best price provisions of the Williams Act as relating to disclosure, these provisions are only tangentially related to ensuring that investors make fully informed decisions. While the All Holders Rule thus has little to do with ensuring complete disclosure, it is no less related to disclosure than are the proration and best price provisions. Moreover, the SEC has articulated a disclosure justification for the Rule:

> [t]he all-holders requirement would realize the disclosure purposes of the Williams Act by ensuring that all members of the class subject to the tender offer receive information necessary to make an informed decision regarding the merits of the tender offer. If tender offer disclosure is given to all holders, but some are barred from participating in the offer, the Williams Act disclosure objectives would be ineffective.

51 Fed.Reg. at 25,875 (footnote omitted). In light of the loose definition that *Schreib-*

4. Sections 13(e) and 23(a) of the Exchange Act provide the SEC with authority to promulgate rules governing tender offers. 15 U.S.C. §§ 78m(e), 78w(a) (1982 & Supp. IV 1986). We note, however, that during the SEC rulemaking that produced the All Holders Rule, many commentators argued that the SEC did not have authority to promulgate the All Holders Rule. 51 Fed.Reg. at 25,874.

er itself ascribes to the meaning of a "disclosure" provision, the emphasis in *Schreiber* on characterizing the Williams Act as a disclosure statute *simpliciter* is of small force in an effort to invalidate the All Holders Rule. For the foregoing reasons, we are satisfied that the SEC was acting within its authority in promulgating the All Holders Rule. This conclusion is buttressed by the deference due the agency's interpretation of its enabling statute, the statute being ambiguous on the issue and the agency's interpretation being a permissible one. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed. 2d 694 (1984).

The holding of *Schreiber*—that misrepresentation or nondisclosure is a necessary element of a violation of section 14(e)—is not compromised by a determination that the All Holders Rule is a valid exercise of SEC rulemaking authority. The All Holders Rule is not an attempt to proscribe manipulative practices so much as an attempt to ensure that all holders of a class of securities subject to a tender offer receive fair and equal treatment. And, as explained in the SEC's release, this attempt to ensure fair and equal treatment is the purpose behind both the proration and best price provisions. 51 Fed.Reg. at 25,876.

3. *Do the relevant provisions of the Williams Act properly permit the implication of a private right of action?*

■ The *Angelastro* methodology next requires us to determine whether the provisions of the Williams Act pursuant to which the All Holders Rule was promulgated create an implied remedy. If not, "[n]o private right of action may be implied ... since an agency's rulemaking power cannot exceed the authority granted to it by Congress." *Angelastro,* 764 F.2d at 947.

In determining whether a statute creates a private remedy despite the absence of an express private remedy provision, " '[t]he key to the inquiry is the intent of the Legislature.' " *Curran,* 456 U.S. at 377–

78, 102 S.Ct. at 1838–39 (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 13, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981)). As explained above, however, the language and legislative history of the Williams Act are essentially silent as to the existence of a private right of action to enforce its provisions. We must thus take into account the background understanding under which Congress operated when it passed the statute. *Id.* 456 U.S. at 378–88, 102 S.Ct. at 1839–44. If Congress operated against a background understanding that courts would create private remedies that would further the purposes of the statute, then Congress most likely intended that a statute be enforceable through a private right of action unless the language (or legislative history) of the statute obviates this inference. In short, courts must take into account the " 'contemporary legal context' " informing what Congress perceived itself to be doing when it acted. *Id.* at 379, 102 S.Ct. at 1839 (quoting *Cannon v. University of Chicago,* 441 U.S. 677, 698–99, 99 S.Ct. 1946, 1958, 60 L.Ed.2d 560 (1979)); *see also* Stewart and Sunstein, *Public Programs and Private Rights,* 95 Harv.L.Rev. 1193, 1229–32 (1982).

Congress passed the Williams Act in 1968. By then the private right of action under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, had been firmly established by a host of lower federal court decisions. *See generally Herman & MacLean v. Huddleston,* 459 U.S. 375, 380 n. 10, 103 S.Ct. 683, 686 n. 10, 74 L.Ed.2d 548 (1983); *Chris–Craft,* 430 U.S. at 55 n. 4, 97 S.Ct. at 956 n. 4 (dissenting opinion). Moreover, the leading Supreme Court case on the implication of private remedies at that time was *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). *Borak* held that the shareholders of a corporation had a right of action against the corporation, both individually and through a derivative action, when it violated section 14(a) of the Exchange Act by obtaining shareholder approval of a merger through false and misleading proxy statements. Despite the absence of an ex-

press private remedy under section 14(a), the Court unanimously held that section 14(a) could be privately enforced because "enforcement of the proxy rules provides a necessary supplement to [Securities and Exchange] Commission action.... [T]he possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement of the proxy requirements." 377 U.S. at 432, 84 S.Ct. at 1560.

According to the SEC, the All–Holders Rule was promulgated pursuant to sections 14(d) and 14(e) of the Williams Act. 51 Fed.Reg. at 25,875.[5] As discussed *infra*, at 1003, section 14(e), the fraud provision of the Act, has been found to create a private right of action. Similarly, courts have held that sections 14(d)(6) and 14(d)(7) create private rights of action. *See Pryor v. United States Steel Corp.*, 794 F.2d 52, 57–58 (2d Cir.) (shareholders have right of action under section 14(d)(6)), *cert. denied*, 479 U.S. 954, 107 S.Ct. 445, 93 L.Ed.2d 393 (1986); *Field v. Trump*, 850 F.2d 938, 946 (2d Cir.1988) (shareholders have right of action under section 14(d)(7)).

In light of the judicial construction of Rule 10b–5 and *Borak*, it is reasonable to conclude that Congress passed the Williams Act with an understanding that courts would construe the Act as creating private remedies that would enforce the provisions of the Act effectively. What constitutes effective enforcement of a statute is of course itself a difficult question. While a private remedy tends to increase the level of enforcement, increased enforcement is not necessarily consonant with the level of enforcement contemplated by Congress in passing the statute. Although *Borak* did not address this point, and it is not easy to discern what Congress had in mind with respect to the appropriate level of enforcement of the Williams Act, the presumption that Congress acted with an understanding of how courts have construed its statutes suggests that we should construe congressional silence regarding desired enforcement levels as supporting a

high level of enforcement, for Congress was legislating against a background of ready judicial implication of private remedies.

The Supreme Court has held that "whether the plaintiff is 'one of the class for whose *especial* benefit the statute was enacted' " is a " 'relevant' ... factor[ ]" in "determining whether a private remedy is implicit in a statute not expressly providing one." *Chris–Craft*, 430 U.S. at 37, 97 S.Ct. at 947 (quoting *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975)); *see also Curran*, 456 U.S. at 391 n. 91, 102 S.Ct. at 1846 n. 91. The Williams Act was enacted for the purpose of protecting target company shareholders. *Chris–Craft*, 430 U.S. at 35–36, 39, 97 S.Ct. at 946, 948. Because the "class sought to be protected by the Williams Act are the shareholders of the target corporation," it would also be " 'consistent with the underlying purposes of the legislative scheme to imply' " a private remedy for these shareholders. *Chris–Craft*, 430 U.S. at 39, 97 S.Ct. at 948 (quoting *Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087) (emphasis omitted). A private remedy will enable injured shareholders to seek damages to compensate for loss stemming from violation of the Act and an injunction against a tender offer violating the Act where the requirements for equitable relief have been met.

In light of the considerations set forth above we conclude that Congress intended to create a private right of action enabling target company shareholders to enforce the provisions of the Williams Act pursuant to which the All Holders Rule was promulgated.

4. *Will implying a private right of action under the All Holders Rule further the purpose of the Williams Act?*

The final of the three *Angelastro* questions is whether the purpose of the enabling statute is furthered by creating a

---

**5.** The Commission also references sections 13(e) and 23(a) (of the Exchange Act), provisions giving the SEC rulemaking authority. The rulemaking authority provisions are irrelevant to the present inquiry, however, as the SEC rulemaking did not address whether there was a private right of action.

private right of action. As noted above, the All Holders Rule is the same type of prohibition as that contained in section 14(d)(6) (the proration provision), and section 14(d)(7) (the best-price provision), and the enforcement of these provisions through a private right of action has been held to further the purposes of the Williams Act. The reasons behind that determination—the need to provide a high enforcement level to deter violations, to compensate injured shareholders and to allow them to protect themselves from irreparable harm through an injunction—apply with equal force to the All Holders Rule. We therefore conclude that the All Holders Rule creates a private right of action *for shareholders*. There is no evidence, however, that it creates a private right of action for the target corporation. We must therefore address the question whether a target company nonetheless has standing to sue for violation of the Rule.

> 5. *Does a target company have standing to assert the interests of its shareholders in a suit to enjoin a tender offer in violation of the All Holders Rule?*

The Supreme Court has held that "the sole purpose of the Williams Act" is to protect "target [company] shareholder[s]." *Chris–Craft*, 430 U.S. at 35, 97 S.Ct. at 946. As explained above, the Court has also held that one of the "several factors [that] are relevant" in "determining whether a private remedy is implicit in a statute

not expressly providing one" is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted.' " *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (quoting *Texas & Pacific Railway v. Rigsby*, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916) (emphasis added)). In view of these factors there can be no doubt that shareholders injured by a tender offer in violation of the Rule have standing to sue the tender offeror for either monetary or injunctive relief. No reported decision, however, has discussed the question whether a target company has standing to seek to enjoin a tender offer in violation of the All Holders Rule.[6] We find the question a difficult one.

■ We first discuss the constitutional facet of the standing requirement. The Constitution requires that a plaintiff "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Polaroid has no problem in meeting this aspect of the standing requirement, as it is evident that Polaroid can reasonably determine that it will be injured by the successful conclusion of Shamrock's tender offer. *Cf. Unocal*, 493 A.2d at 954 (board of directors (of a Delaware corporation such as Polaroid) addressing a pending takeover bid "has an obligation to determine whether the offer is in the best interests of the corporation and its shareholders"); Beb-

---

6. Polaroid cites *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), as standing for the proposition that target corporations can assert Williams Act violations in a suit against the acquiror. We read the opinion, however, as not reaching the private cause of action or standing questions, which are never discussed, but instead as addressing only the question whether a showing of irreparable harm is necessary for a private litigant to obtain injunctive relief in a suit under § 13(d) of the Williams Act, 15 U.S.C. § 78m(d). Although one might infer the existence of a private right of action from a discussion concerning whether or not relief was available absent irreparable harm, the Court appeared to limit its holding to the question of an appropriate remedy. *Id.* at 62–63, 95 S.Ct. at 2078. Since *Rondeau* was handed down the same day

as *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the leading case on how to infer implied private rights of action, it seems unlikely that the Court would have held that an implied right of action arose out of § 13(d) without any discussion of the issue. A number of courts have similarly read *Rondeau* as not reaching the question of whether § 13(d) creates a private right of action. *See, e.g., Liberty Nat'l Ins. Holding Co. v. Charter Co.*, 734 F.2d 545, 560–61 (11th Cir.1984); *Gateway Indust, Inc. v. Agency Rent A Car, Inc.*, 495 F.Supp. 92, 95 n. 6 (N.D.Ill.1980). Even if *Rondeau* stood for the proposition that a target corporation has standing to raise a claim under § 13(d), such a proposition would not necessarily establish that it has standing to raise a claim under the All Holders Rule.

chuk, *The Case for Facilitating Competing Tender Offers*, 95 Harv.L.Rev. 1028 (1982) (a successful bid by a tender offeror may foreclose a higher bid by a third party). The Supreme Court has also held that although a plaintiff must show injury to obtain standing, there is no constitutional requirement that the merits of the lawsuit directly relate to the plaintiff's injury. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

■ Polaroid thus meets the constitutional requirements of standing. The Supreme Court, however, has held that the sole purpose of the Williams Act is to protect target company shareholders. In raising a claim under the Williams Act, Polaroid is therefore seeking to vindicate not its own rights but the rights of its shareholders. The issue in this case is consequently whether Polaroid has "third party" or *"jus tertii"* standing to assert the right of Polaroid shareholders to a tender offer that does not violate the All Holders Rule. *See generally* Monaghan, *Third Party Standing*, 84 Colum.L.Rev. 277 (1984); Sedler, *The Assertion of Constitutional* Jus Tertii: *A Substantive Approach*, 70 Calif.L. Rev. 1308 (1982); C. Wright, A. Miller, & E. Cooper, 13 *Federal Practice and Procedure* § 3531.9 (1984).

One context in which the Supreme Court has freely allowed *jus tertii* standing is when an association raises the rights of its members. Trade associations, public interest groups and other such associations have been permitted, for example, to challenge federal agency rules under the Administrative Procedure Act's judicial review provision, despite the language of the provision, which merely states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. *See National Motor Freight Traffic Association v. United States*, 372 U.S. 246, 247, 83 S.Ct. 688, 689, 9 L.Ed.2d 709 (1963) (per curiam); *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 40, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976); *Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221, 230–31 n. 4, 106 S.Ct. 2860, 2866–67 n. 4, 92 L.Ed.2d 166 (1986). *Sierra Club* described this doctrine as an example of a more general principle that "an organization whose members are injured may represent those members in a proceeding for judicial review." 405 U.S. at 739, 92 S.Ct. at 1368.

Organizations raising constitutional challenges brought under 42 U.S.C. § 1983 have also been allowed to gain standing by asserting the interests of their members. The Court has formulated the doctrine as follows:

> an association has standing to bring suit on behalf of its members when ... (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

If Polaroid fit within the contours of this *jus tertii* associational standing doctrine, we could hold that it had standing to raise the rights of its shareholders, who can sue under the All Holders Rule, and thus itself sue under the Rule. Weighing in favor of allowing such standing is that while individual shareholders may often find the cost of the litigation beyond their means, the target corporation will usually have the resources to finance it, and, in many cases, this will have the salutary effect of enforcing the securities laws. A number of considerations, however, weigh against allowing the corporation *jus tertii* standing to represent the interests of its shareholders based on associational standing.

The interest that a corporation would be vindicating in such a suit is the right of some of its shareholders to sell at a price equal to that of other of its shareholders to a third party, the tender offeror. This is

an interest different in kind from that pursued in a corporation's ordinary litigation, which seeks to protect the corporation's business. Shareholders in a widely traded corporation such as Polaroid are generally free to sell their stock on any terms that they wish without interference from the corporation. While shareholders band together to form an organization with a single management to run a business, this endeavor does not normally include protecting shareholders in their relationships with third parties. It is thus doubtful whether "the interests" that Polaroid "seeks to protect" in its litigation under the All Holders Rule "are germane to the organization's purpose." *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. *See* C. Wright, A. Miller, & E. Cooper, 13 *Federal Practice and Procedure* § 3531.9 at 617 ("The greatest care [in extending association standing] ... should be taken with organizations that ordinarily would not be expected to undertake litigation on behalf of their constituents. An ordinary commercial corporation, for example, generally should not be permitted to borrow standing from injured stockholders.").

In addition to this concern, the inherent conflicts of interest in litigation under the All Holders Rule may make a corporation a poor representative of shareholder interests. Although an association may rely on the standing of its members to assert standing for itself by showing that only one of its members has the type of redressable injury that would give it standing to sue individually, *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975), associational standing has never been granted in the presence of serious conflicts of interest either among the members of an association or between an association and its members.

The first potential conflict is between those shareholders who view litigation to enjoin a tender offer as adversely affecting their opportunity to collect on the tender offer premium and those shareholders who are cut out of the tender offer and thus may want to see it defeated. Even though some shareholders are disadvantaged by their exclusion from the tender offer, a great majority of shareholders will often benefit from the offer. A corporation is thus an uncertain representative for the interests of the disadvantaged shareholders, as it may have an eye to protecting the interests of the majority. This undermines the basis for *jus tertii* standing—that the *jus tertii* advocate will vigorously assert the interests of the right-holder. *See Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976); *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (plurality opinion). Indeed, one basis for the *constitutional* requirement that a litigant have a personal stake in a litigation is "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." *Simon v. Eastern Kentucky Welfare Right Organization*, 426 U.S. 26, 38 n. 16, 96 S.Ct. 1917, 1924 n. 16, 48 L.Ed.2d 450 (1976) (quoting *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

The second conflict of interest that may interfere with the proper conduct of the litigation in some cases is that between the management of a corporation and its shareholders. Even shareholders injured by their exclusion from a tender offer may sometimes profit handsomely from the tender offer and be injured by litigation that defeats it. The market price of the stock of a corporation jumps skyward within minutes after a credible tender offer is made. Excluded holders of the security can thus profit from the tender offer by selling their shares at the market price to third parties. If the excluded holders fail to sell to third parties, they still have the shares they started out with when the tender offer closes; in this sense they are no worse off than if there had been no tender offer. Indeed, they may be better off since they now have a suit for damages against the tender offeror who excluded them from the tender offer.

While shareholders (including those excluded from the offer) thus have a reason to react favorably to many tender offers, those in control of the target corporation

have a natural incentive to resist a corporate takeover. Unless protected by "golden parachutes" guaranteeing them a lucrative exit from corporate affairs, the corporation's top officers may suffer a substantial loss in future earnings if the tender offer is successful. As Polaroid's home state of Delaware has recognized, measures adopted to ward off a takeover raise "the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders...." *Unocal*, 493 A.2d at 954.[7]

The mere presence of a conflict of interest does not, of course, prove that management's hostile reaction to a tender offer is not in the best interests of shareholders. Indeed, Delaware law requires that a board addressing a pending takeover bid "to determine whether the offer is in the best interests of the corporation and its shareholders." *Unocal*, 493 A.2d at 954. Nevertheless, the presence of a genuine conflict of interest in many takeover situations weighs heavily against allowing cor-

porations to assert the rights of shareholders under an associational *jus tertii* standing theory.

For all the foregoing reasons, it would appear that Polaroid does not fit within the confines of the associational standing *jus tertii* doctrine.[8]

We nonetheless consider a number of possible counterarguments to the conclusion that a target corporation does not have *jus tertii* standing to assert the interests of its shareholders under the All Holders Rule.

Polaroid has asserted that "[t]he public interest is ... clearly in favor of the enforcement of the securities laws." Appellant's Brief at 37. Unfortunately, this facile assertion does not take us too far. It fails to consider whether such relief will result in an enforcement level in excess of that desirable from a policy perspective or that contemplated by Congress. It also fails to consider the impact of such relief on any congressional decision to entrust regulatory decisions to a centralized, specialized, and more politically accountable

---

7. While those who manage the corporation have a fiduciary duty to respond to takeovers in the best interests of the corporation's shareholders, this legal duty may only limit the extent to which the disparate interests of management and shareholders affect managerial behavior. *See generally Edgar v. MITE Corp.*, 457 U.S. 624, 643–44, 102 S.Ct. 2629, 2641, 73 L.Ed.2d 269 (1982) (describing welfare and incentive effects of corporate takeovers); E. Herman, *Corporate Control, Corporate Power* (1981); Easterbrook & Fischel, *The Proper Role of a Target's Management in Responding to a Tender Offer*, 94 Harv. L.Rev. 1161 (1981); Lowenstein, *Pruning Deadwood in Hostile Takeovers: A Proposal for Legislation*, 83 Colum.L.Rev. 249 (1983).

8. We note that under the doctrine of *jus tertii*, standing has also been freely extended outside of the association context. In *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), for example, a beer vendor brought suit challenging the constitutionality of an Oklahoma law that prohibited selling beer to males under age 21 and females under age 18. The Court held that the vendor had *jus tertii* standing to raise the equal protection rights of males 18–20 years of age. The Court reasoned that not allowing "vendors and those in like positions ... [to] act[ ] as advocates of the rights of third parties who seek access to their market" would ensure that " 'enforcement of the challenged restriction against the [vendor] would

result indirectly in the violation of third parties' rights.' " *Id.* at 195, 97 S.Ct. at 456 (quoting *Warth*, 422 U.S. at 510, 95 S.Ct. at 2211).

Applying *Craig* to the instant case, one could argue that Polaroid is a vendor of its stock and its shareholders are the vendees. The argument fails, however, because the cases allowing vendors to raise the rights of their vendees (or lessors the rights of their lessees, *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), or doctors the rights of their patients, *Singleton*, 428 U.S. 106, 96 S.Ct. 2868) all involve a litigation in which the merits of the suit involve the legitimacy of a restriction on the relationship between the vendor and the vendee. This is not the case here. Polaroid is not trying to object to any interference with its ability, for example, to sell stock or distribute dividends or proxies to its shareholders. Rather, Polaroid is objecting to the unequal treatment of its shareholders by a third party. Thus Polaroid and its shareholders do not necessarily have a unity of interest in the litigation, as it does not challenge an interference with their mutual freedom to interact. Nor is Polaroid the "obvious claimant," *Craig*, 429 U.S. at 197, 97 S.Ct. at 456, since a violation of the All Holders Rule does not directly interfere with Polaroid's interaction with its stockholders. In addition, the conflict of interest problems discussed in text above in the associational standing context apply here as well.

body such as the SEC rather than private litigants and the courts. Finally, it fails to consider the extent to which the social benefits of enforcement may be incommensurate with the social costs in light of the costs of the litigation to the parties and the judicial system, the cost of uncertainty imposed by the litigation on the capital markets, the cost of compliance, and the cost resulting from the possibility that the litigation may defeat the tender offeror's efforts to consummate what may be a socially beneficial transaction.[9] The text and legislative history of the Williams Act (and the administrative history of the All Holders Rule) are silent on the issue. As the foregoing demonstrates, any attempt to rely upon one's own conception of what would constitute good tender offer policy, in addition to being inappropriate, is too latent with difficulties to yield a definitive answer.

Rather than invoking policy arguments, it might be argued that, as in the implied right of action inquiry discussed above, a court should presume that Congress expected courts to continue to apply the *jus tertii* standing doctrine extant at the time Congress passed the legislation. This argument, however, is unlikely to be of any help to Polaroid, as the *jus tertii* doctrine was no more liberal at the time that Congress passed the Williams Act. *See* Sedler, *supra,* 70 Calif.L.Rev. at 1308–09.[10]

As explained *infra* at 1003, this Court has held that target corporations have standing to raise a claim under section 14(e) that the tender offer contains fraudulent misrepresentations or omissions. The best argument for allowing target corporations standing to sue under the All Holders Rule may thus be that there is no reason to distinguish All Holders Rule standing from misrepresentation standing. There is, however, a reason to draw this distinction. The bar against misrepresentation is meant to protect all shareholders. Shareholder litigation under the aegis of the corporation makes greater sense in this context, where the class of persons whose rights the corporation is vindicating constitutes all of its shareholders. The All Holders Rule, by contrast, protects what are likely to be only a minority of shareholders. Moreover, it may be more difficult to detect fraud than to detect violations of the All Holders Rule, and the possibility of irreparable harm may be greater in the case of fraud because of the greater difficulty in computing monetary loss. The need for target corporation standing in the fraud context may thus be greater than in the context of the All Holders Rule. Finally, the rule that target corporations have standing to sue for fraud was adopted by this Court without discussion; the Court simply reached the merits in such suits. While we do not question the continued efficacy of target corporation standing in fraud suits, the manner in which the rule was adopted should make us hesitant to construe it as definitively settling the question of target corporation standing outside of the fraud context.

We therefore hold that, although the All Holders Rule creates a private right of action enabling injured shareholders to sue a tender offeror whose offer violates the

---

**9.** *See generally* Stewart and Sunstein, *supra,* 95 Harv.L.Rev. at 1289–1307; Frankel, *Implied Rights of Action,* 67 Va.L.Rev. 553, 570–85 (1981); R. Posner, *The Federal Courts: Crisis and Reform* 270–72 (1985).

**10.** That *Borak,* 377 U.S. at 431–33, 84 S.Ct. at 1559–60, allowed a shareholder derivative suits to vindicate shareholder rights under § 14(a) of the Exchange Act (regulating proxies) is not to the contrary. Although technically brought as a suit by the corporation, the shareholder derivative suit is, in substance, not a corporate suit against a third party but a shareholder suit against those in control of the corporation. The inference that the Congress that passed the Williams Act intended to allow target corpora-

tions to sue in situations such as the All Holders Rule is weak at best. Moreover, the Court stated in *Borak* that "[t]he injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder." 377 U.S. at 432, 84 S.Ct. at 1560. This is precisely the opposite of the All Holders situation, where the damage is done to the excluded stockholder individually in a tender offer that may generally benefit other stockholders. *See Chris–Craft,* 430 U.S. at 32 n. 21, 97 S.Ct. at 945 n. 21 (emphasizing that *Borak* involved injury to shareholders as a group rather than shareholders individually).

Rule, a target corporation has no standing to sue under the Rule.[11] We thus affirm the district court's refusal to grant a preliminary injunction on the basis of Polaroid's All Holders Rule claim.

### C. Matters for Consideration in the Remanded Proceeding

Because we hold that Polaroid does not have standing to raise a claim under the All Holders Rule, we do not determine the merits of the district court's denial of Polaroid's motion for a preliminary injunction on this issue. The All Holders issue is, however, unlikely to disappear from this case for long. The case will perforce return to the district court for further proceedings, and since the Polaroid ESOP, as a shareholder of the target corporation, has standing to raise an All Holders claim, *see* discussion *supra*, at 997, and since it may well have not done so on the assumption that Polaroid's litigation would vindicate its interest, it seems likely that the Polaroid ESOP (or an ESOP shareholder with a vested right) may seek leave to intervene as a party plaintiff asserting a violation of the Rule as a basis to enjoin Shamrock's tender offer. We thus believe that it will be use-ful to make several observations for the benefit of the district court that bear upon the contention that Shamrock's tender offer violates the All Holders Rule.

The district court held that the *"particular facts of this case"* allow Shamrock to exclude the Polaroid ESOP shares from its tender offer. 698 F.Supp. at 1174. The "particular circumstances" to which the district court was referring are the litigation in the Delaware Chancery Court and the stated intention to amend the Offer. This strikes us as a frail reed upon which to rest a decision. Particularly in view of the strength of Polaroid's All Holders Rule violation claim, the district court's exception would swallow the rule.[12]

For Polaroid to obtain a preliminary injunction, it must show that it will be irreparably injured *pendente lite* if the preliminary injunction is not granted.[13] But as we have explained *supra*, at 997, if Shamrock completes the tender offer and the ESOP shares were subsequently declared valid, the owners of these shares would be able to sue (presumably through the ESOP trustee) for money damages arising out of their exclusion from the tender offer. The

---

**11.** Judge Cowen suggests in dissent that our conclusion with respect to target corporation standing under the All Holders Rule may be dictum because we enjoin the tender offer anyway on other grounds. Dissenting Opinion, at 1007 n. 2. While it is true that we determine that Polaroid is entitled to injunctive relief under section 14(e), the injunctive relief that we grant under that section is very different from the injunctive relief that Polaroid would be entitled to if we determined that it had standing under the All Holders Rule (and that injunctive relief was appropriate on the basis of the Rule). Injunctive relief under section 14(e) merely halts the tender offer until corrective disclosure is made. This could be done in a few days or less, allowing the tender offer to proceed as before. Injunctive relief under the All Holders Rule, by contrast, would require Shamrock to restructure its tender offer to include the Polaroid ESOP shares. Thus resolution of the All Holders Rule standing issue has a direct effect on the relief that we grant and cannot be considered dictum.

**12.** We also note that the merits of Shamrock's contention that the Polaroid ESOP shares are invalid have never been presented to the district court or this Court by either Polaroid or Shamrock. While Polaroid has the burden of proof on a motion for a preliminary injunction, the

shares issued to the Polaroid ESOP are presumed valid under Delaware law until proven otherwise. In addition, Shamrock has never explained what it means by its assertion that the Polaroid ESOP shares are "invalid." If Shamrock succeeded in demonstrating that the shares were issued in violation of Polaroid's directors' duties of care and loyalty, would the ESOP shares simply disappear? Or would the Polaroid directors merely be subject to a damage judgment or some other remedy?

**13.** Polaroid argues to the contrary, relying upon its construction of the All Holders Rule as mandating that "there shall be no offer" unless certain conditions are met. Transcript of Oral Argument at 28. If the issue is engaged, the district court on remand should consider whether Polaroid's argument is consistent with *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975) (injunction under section 13(d) of the Williams Act requires a showing of irreparable harm). *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982) ("[A] major departure from the long tradition of equity practice should not be lightly implied" in construing a statute.)

district court would thus have to consider, even assuming a violation of the All Holders Rule, why legal relief for damages would not be an adequate remedy at law barring injunctive relief. Polaroid intimates that a suit for damages will be inadequate because the damages will be so high that Shamrock and any other defendants in such a suit will not be able to satisfy the judgment. It will have to prove this point. Its assertion that the damages would be in excess of $480 million plus interest, a figure which it arrives at by multiplying the number of ESOP shares by $42 per share, would seem inaccurate, as it assumes that but for a Shamrock tender offer for $42 per share for the ESOP shares, the ESOP shares are worth $0 per share.

Polaroid also argues that a damage remedy would be inadequate because Shamrock, if it amends its tender offer to include the Polaroid ESOP shares, might choose to keep the offer open for only ten days, in accordance with the Rule 14e–1(b) minimum, rather than the twenty days that Rule 14e–1(a) requires for initial tender offers. 17 C.F.R. § 240.14e–1. If the point is engaged, the district court should consider whether an extra ten days would be of sufficient utility to the ESOP shareholders in this case to justify an injunction, since the ESOP shareholders, as employees of Polaroid, have undoubtedly been following the progress of Shamrock's bid with close scrutiny. The district court should also consider whether the contingency that Shamrock may amend its tender offer to include the ESOP shares (and then keep the offer open for fewer than twenty days) is too speculative to support the grant of equitable relief.[14]

### III. THE MISREPRESENTATION CLAIM

■ Polaroid contends that Shamrock's September 9, 1988, Offer did not disclose all material information concerning the important issue of whether the Offer complied with Federal Reserve Board margin

regulations. Section 14(e) of the Williams Act makes it

> unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders....

15 U.S.C. § 78n(e). A target company such as Polaroid has standing to sue, under section 14(e)'s implied right of action, to enjoin misrepresentations made by a tender offeror in connection with the offer. *See City Capital Associates v. Interco Inc.*, 860 F.2d 60 (3d Cir.1988); *Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846 (3d Cir.1973), *cert. denied*, 419 U.S. 870, 95 S.Ct. 129, 42 L.Ed.2d 108 (1974). Our cases have not had occasion to explain why target companies may sue under section 14(e). Judge Friendly for the Second Circuit explained that allowing the target corporation to sue would "best accomplish the purposes of the legislature" because "the superior resources of the corporation ... can be vital in this context[,] where remedial action must be speedy and forceful." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 946 (2d Cir.1969); *see also Florida Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1518–19 (11th Cir.1985). *Cf. Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 42 n. 28, 97 S.Ct. 926, 949 n. 28, 51 L.Ed.2d 124 (1977) (reserving the question).

We turn to the merits of the claim for injunctive relief on misrepresentation grounds.

#### A. Probability of Success

■ Shamrock is a shell corporation without significant operations whose function is to acquire and hold the shares of Polaroid. Shamrock intends to pay for these shares through up to $1.433 billion in bank borrowings, $1.3 billion in nonbank

---

**14.** *Cf.* C. Wright, A. Miller, & E. Cooper, 13A *Federal Practice and Procedure* § 3532.2 at 137– 46 (harm dependent on an uncertain contingency may make a case unripe for decision).

subordinated notes, and $68 million in capital to be contributed by its owner, Emerald.

Under Regulations G, T, U and X, 12 C.F.R. §§ 207, 220, 221, and 224 (1988), promulgated by the Federal Reserve Board under section 7 of the Exchange Act, 15 U.S.C. § 78g (1982 & Supp. IV 1986), loans made to purchase margin stock that are secured directly or indirectly by any margin stock may not exceed 50% of the market value of the stock being purchased. Under the terms of the Offer, Shamrock's secured bank financing will itself exhaust the 50% limitation. Because it has substantially no assets or cash flow to secure its borrowings other than the Polaroid stock that it is purchasing, Shamrock's nonbank subordinated financing will also be presumed to be indirectly secured by the stock acquired by Shamrock, thus exceeding the margin regulations' 50% limitation. *See* 12 C.F.R. § 207.112 (1988); Purchase of Debt Securities to Finance Corporate Takeovers, 51 Fed.Reg. 1,771 (1986).

■ With respect to the nonbank subordinated notes, section 207.112(f) provides three exceptions to the presumption that the debt securities are indirectly secured by

margin stock and hence governed by the 50% limitation: (1) "specific evidence that lenders could in good faith rely on assets other than margin stock as collateral, such as a guaranty of the debt securities by a ... company that has substantial non-margin stock assets or cash flow"; (2) a merger agreement in place between the acquiror and the target company; or (3) the purchase by the acquiror of enough shares of the target to effect a "short-form" merger under applicable state law—in this instance 90%, pursuant to Del.Code Ann. tit. 8, § 253 (1983). The parties concede that, absent a guarantee or merger agreement, Shamrock must acquire 90% of Polaroid's outstanding shares in order to effect a short-form merger and avoid a violation of the margin regulations.[15]

■ The disclosure problem in Shamrock's Offer arises because Shamrock represents that it may consummate its tender offer in compliance with the margin regulations even if it purchases *fewer* than 90% of Polaroid's outstanding shares as long as it purchases 90% of the outstanding shares excluding the ESOP shares.[16] This repre-

---

15. Polaroid has no implied private remedy to sue under Federal Reserve Board margin regulations promulgated pursuant to section 7 of the Exchange Act, 15 U.S.C. § 78g. *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 788–89 (3d Cir.1982), *cert. denied,* 461 U.S. 942, 103 S.Ct. 2118, 77 L.Ed.2d 1300 (1983). Shamrock argues that Polaroid consequently may not raise its margin regulation misrepresentation claim under section 14 of the Exchange Act. That Polaroid may not sue under the margin regulations, however, does not imply that Polaroid may not assert that Shamrock's tender offer misrepresents its compliance with the margin regulations.

16. The relevant paragraph of Shamrock's Offer provides as follows:

*Federal Reserve Board Regulations.* The Margin Regulations promulgated by the Federal Reserve Board place restrictions on the amount of credit that may be extended for the purpose of purchasing margin stock (including the Shares [Polaroid common stock]) if such credit is secured directly or indirectly by margin stock. On January 10, 1986, the Federal Reserve Board announced an interpretative rule relating to the applicability of the Margin Regulations to the issuance of debt securities by a shell corporation in certain situations to finance an acquisition of margin

stock of a target company. The Purchaser was formed solely for the purpose of making the Offer and has no significant operations. Accordingly, debt securities issued by the Purchaser [Shamrock] to finance the acquisition of Shares may be subject to such rule. However, debt securities issued to finance an acquisition are not subject to the interpretive rule if, among other things, the acquisition is conditioned on acquiring a sufficient number of shares to effect a short-form merger under applicable state law or if there is a merger agreement between the acquiring and the target companies. **If the Minimum Condition is satisfied** (or if the ESOP Condition is waived and Minimum Condition, as revised, is satisfied) or the Purchaser and the Company enter into the Proposed Merger Agreement, **the Purchaser believes that the Initial Non–Bank Financing will comply with the Margin Regulations.** The financing arrangements described in Section 10 [of the Offer] are designed to comply with the Margin Regulations. A challenge to such financing arrangements alleging a violation of the Margin Regulations, if adversely determined, could have an adverse effect on the Purchaser's ability to obtain the financing necessary to consummate the Offer. See Section 14 [re Conditions of the Offer].

sentation is inaccurate on a set of circumstances specifically contemplated by the Offer. The violation of the margin regulations would arise if Shamrock decided (1) to consummate the tender offer relying only on its own satisfaction that the ESOP shares are not validly outstanding and (2) the ESOP shares were subsequently determined to be validly outstanding. The ESOP Condition specifically allows for this possibility, as it permits Shamrock to close the tender offer without purchasing the ESOP shares and without "a final judicial determination ... that the ESOP Shares are not validly outstanding" as long as Shamrock is "otherwise ... satisfied that the ESOP shares are not validly outstanding."

 A misrepresentation is material under section 14(e) "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to sell his or her stock." *Staffin v. Greenberg*, 672 F.2d 1196, 1204–05 (3d Cir.1982). Shamrock's misrepresentation is material under this standard. To remedy a violation of the margin regulations, the Exchange Act gives the SEC authority to initiate administrative investigations into alleged margin violations, 15 U.S.C. § 78u(a); to revoke a broker-dealer's registration under the Exchange Act, 15 U.S.C. §§ 78o(b)(4)(D); to seek injunctions in federal court against margin violators, 15 U.S.C. §§ 78u(d)–(e); and to transmit evidence of willful violations of the margin regulations by principal offenders and aiders and abettors to the Attorney General of the United States for institution of criminal proceedings, 15 U.S.C. § 78u(d) (1982 & Supp. IV 1986).[17] Since many of these sanctions run against the lenders, they are likely to have a substantial effect on Shamrock's ability to attract financing, if it chooses to proceed in accordance with terms contemplated in its Offer and violate the margin regulations. These conse-

quences would be of substantial importance to a reasonable shareholder in evaluating Shamrock's tender offer.

 Shamrock argues that precisely because violations of the margin regulations are so serious it has no intention of unilaterally disregarding the ESOP shares without an adjudication from a court, a settlement with Polaroid, or reliance upon an alternative method of financing such as preferred stock or guaranteed debt. Transcript of Oral Argument at 98. The representations of Shamrock's counsel regarding Shamrock's present intention, however, do not cure the misrepresentation in Shamrock's Offer: the Offer represents that Shamrock can consummate the tender offer and not violate the margin regulations without buying the ESOP shares, without an adjudication that the ESOP shares are invalid, without a settlement with Polaroid, and without reliance upon an alternative method of financing.

Accepting counsel's representations as true, there may be little chance that Shamrock will violate the margin regulations; there would also seem, however, to be little chance that Shamrock will consummate its tender offer as expeditiously as its Offer suggests is possible. To avoid violation of the margin regulations, Shamrock will have to delay consummation of the tender offer until it gets an adjudication that the ESOP shares are invalid, a Polaroid settlement, or an alternative financing arrangement. A reasonable shareholder would consider this possibility of delay—in fact realized through the subsequent postponements in the closing of the tender offer—to be important in deciding how to respond to the tender offer.

We therefore hold that Polaroid has a reasonable probability of eventually demonstrating that Shamrock's tender offer contained a material misrepresentation with

---

Offer at 44 (emphasis supplied). As explained *supra*, at 990, the Minimum Condition is satisfied when at least 90% of the outstanding shares excluding the ESOP shares are tendered.

**17.** In addition, the stock exchanges and the NASD are charged with disciplining members who violate the Exchange Act and the margin regulations. Sanctions may include expulsion from the exchange, suspension, limitation of activities, fine, or censure. 15 U.S.C. §§ 78f(b)(6), 78o–3(b)(7).

respect to the Offer's compliance with federal margin regulations. The district court concluded that there was no misrepresentation because the margin regulations permitted Shamrock to waive the 90% Minimum Condition if certain contingencies developed. 698 F.Supp. at 1176. This proposition is not in dispute, but it is beside the point. Shamrock's material misrepresentation was that it did not disclose that the tender offer would violate the margin regulations if Shamrock exercised rights expressly reserved to it under the Offer. The district court therefore erred as a matter of law.

### C. Preliminary Injunctive Relief as an Appropriate Remedy

The four elements necessary to obtain a preliminary injunction are present in this case. As explained above, Polaroid has shown a reasonable probability of eventual success on the merits of its section 14(e) material misrepresentation allegation. Polaroid has also met its burden of showing irreparable harm to its shareholders.

" 'The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information....' " *Chris–Craft*, 430 U.S. at 35, 97 S.Ct. at 946 (quoting *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)). Upon the announcement of a tender offer, shareholders must decide whether to tender their shares, retain their shares or sell their shares to arbitrageurs willing to assume the risk that the tender offer premium might disappear if the tender offer fails. The theory of the Act is that shareholders are unable to protect their interests fully in making these decisions if the tender offeror fails to provide all material information regarding the offer. Irreparable harm arises because of the difficulty of proving money damages in a suit based upon material misrepresentations by the tender offeror. While Congress has determined that accurate disclosure is important to shareholders, it would often be impossible for shareholders to prove that on the facts of their particular tender offer accurate disclosure would have affected their decision making in a particular way with concomitant quantifiable monetary loss. The inadequacy of a remedy at law and the importance that Congress has attached to accurate disclosure of material information establishes irreparable harm.

The third factor to consider, whether grant or denial of the injunction is likely to cause harm to other interested persons, is not applicable to the instant case. Aside from Shamrock and Polaroid's shareholders, whose interest Polaroid has raised in this suit, no one else appears to have an interest that could be significantly harmed by the grant or denial of the injunction.

The fourth factor, whether issuance of this injunction would be in the public interest, presents a difficult question. The injunction may defeat a takeover which may be socially beneficial. The decision that Congress made in passing the Williams Act, however, was that notwithstanding any benefits of takeovers, they were not in the public interest if effected through tender offers containing material misrepresentations. Although Congress did not make clear what level of enforcement it thought appropriate, we are loathe to say that issuance of this injunction would not be in the public interest in light of Congress' decision to outlaw tender offers containing material misrepresentations.

Because Polaroid has satisfied its burden of showing that it could eventually demonstrate that Shamrock's tender offer contained a material misrepresentation, that Polaroid's shareholders will be irreparably harmed *pendente lite* if equitable relief is withheld, and has otherwise met its burden of demonstrating the need for a preliminary injunction, we will vacate the order of the district court and remand with instructions that the court preliminarily enjoin Shamrock's tender offer until such time as it makes appropriate corrective disclosure in accordance with this opinion or until such time as the district court makes a final determination as to the appropriateness of an injunction.

## IV. CONCLUSION

For the foregoing reasons, the order of the district court, insofar as it denies preliminary injunctive relief on the grounds of alleged violation of the All Holders Rule or the putative "bidder" status of Wertheim Schroder & Co. Inc. and Drexel Burnham Lambert Inc. will be affirmed. However, with respect to the misrepresentation claim, the order will be vacated and the case remanded with instructions that the court preliminarily enjoin Shamrock's tender offer until such time as it makes appropriate corrective disclosure in accordance with this opinion or until such time as the district court makes a final determination as to the appropriateness of an injunction. The motion for injunction pending appeal will be denied as moot. The parties will bear their own costs.

COWEN, Circuit Judge, concurring in part and dissenting in part:

### I.

I agree with the majority that we should reverse the district court's refusal to grant preliminary injunctive relief on the basis that Polaroid has demonstrated it is entitled to this relief under the theory that the Disney interests have violated section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). I therefore concur with that portion of the majority's opinion which discusses section 14(e) and concludes that Polaroid is entitled to injunctive relief under this claim.[1]

I write separately, however, because I believe that Polaroid has also demonstrated that it is entitled to relief on the basis that the Disney interests have violated the All–Holders Rule, 17 C.F.R. § 240.14d–10(a). I disagree with the majority's conclusion that Polaroid, as a target company, lacks standing to assert this violation. I believe that the majority's conclusion conflicts with other decisions of this Court holding that target corporations do have standing to assert violations of the Williams Act (and the regulations promulgated thereunder). Since I also find that Polaroid has otherwise met the requirements for preliminary injunctive relief, I dissent from that part of the majority's decision which concludes that Polaroid is not entitled to this relief as a remedy for Shamrock's probable violation of the All–Holders Rule.[2]

### II.

The All–Holders Rule, 17 C.F.R. § 240.14D–10(a), states that a bidder's tender offer must be open to "all security holders of the class of securities subject to the tender offer." Since the ESOP plan holds 9.7 million shares of common stock, and the Shamrock tender offer is an offer to purchase all of Polaroid's common stock except that controlled by the ESOP plan, the Shamrock offer plainly violates both the letter and the spirit of the All–Holders Rule.[3]

As the majority opinion makes clear, see Majority at 994–96, the All–Holders Rule was promulgated by the SEC to en-

---

1. I also agree that this Court's recent decision in *City Capital Associates Limited Partnership v. Interco Inc.*, 860 F.2d 60 (1988), is controlling on the issue of whether Wertheim Shroder & Co. and Drexel Burnham Lambert Inc., Shamrock's financial advisors, are "bidders" for Polaroid, as that term is used in 17 C.F.R. § 240.14d, Schedule 14d–1, Item 9. We therefore must affirm the district court's finding that Shamrock's offer did not violate this regulation when it failed to disclose the financial condition of these institutions. *See* Majority at 991 n. 2.

2. I would note, however, that the majority's conclusion that a target company lacks standing to assert a violation of the All Holders rule may be dicta, since it determines that Polaroid is entitled to preliminary injunctive relief on the basis of the probable § 14(e) violation.

3. I reject the reasoning of the district court, which held that the "particular facts of this case" allowed Shamrock to exclude the ESOP shares from its tender offer. The fact that Shamrock has filed an action in the Delaware Chancery Court seeking to "invalidate" the ESOP shares, and has stated its "present intention" to amend its offer should that action not be successful is an insufficient basis to find that the All–Holders Rule does not apply. When Shamrock initiated its offer, the ESOP shares were valid and outstanding shares of Polaroid common stock. They remain valid and outstanding at the date of the filing of this opinion. Plainly, the holders of ESOP shares were, and are "security holders of the class of securities subject to the [Shamrock] tender offer." 17 C.F.R. § 240.14d–10(a).

force and further the purposes of section 14(e) of the Williams Act, which proscribes "fraudulent or manipulative acts ... in connection with any tender offer." 15 U.S.C. § 78n(e). The majority concludes that while the rule "is not an attempt to proscribe manipulative practices so much as an attempt to ensure that all holders of a class of securities subject to a tender offer receive fair and equal treatment," it "is a valid exercise of SEC rulemaking authority." Majority at 995. In holding that the regulation is valid, the majority implicitly acknowledges that the All–Holder Rule has the force of law and that it is "related to disclosure." [4]

I depart from the majority when it concludes that a target corporation does not have standing to assert a violation of the All–Holders Rule. Admittedly, the majority's exhaustive analysis of constitutional, associational, and *jus tertii* standing does offer some persuasive reasons supporting its finding that a target corporation does not have standing to assert a violation of the All–Holders Rule. We do not, however, address this issue in the abstract. Continuity and consistency in the law are legitimate and important concerns.

The majority opinion holds that a target company like Polaroid has standing to sue to enjoin a tender offer when it violates section 14(e) of the Williams Act's prohibition against material misrepresentations. Majority at 1003. In reaching the conclusion that a target company has standing to assert a section 14(e) violation, it relies on two previous decisions of this Court, *City Capital Associates Limited Partnership v. Interco Inc.*, 860 F.2d 60 (3d Cir.1988) and *Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846 (3d Cir.1973), and Judge Friendly's opinion in *Electronic Spe-*

*cialty Co. v. International Controls Corp.*, 409 F.2d 937, 946–47 (2d Cir.1969). Thus, the majority acknowledges and holds that there is a substantial body of precedent to support the finding that a target corporation has standing to assert a violation of section 14(e).

The All–Holders Rule, as noted above, was promulgated by the SEC pursuant to its delegated authority to further and enforce section 14(e). It has the force of law, and is also, as noted above, "related to disclosure." *See* note 4 *supra*. To hold, as the majority does, that a target corporation has standing to assert a violation of section 14(e), but does not have standing to assert a violation of a valid regulation promulgated to further and enforce section 14(e) departs from our precedent, and undermines the goal of continuity and consistency in the law.

Such a departure is particularly unwarranted where no strong policy reason underlies the new distinction. I acknowledge that the potential exists for a conflict of interest between a corporation's managers and its shareholders in the context of an effort to enjoin a hostile tender offer. The potential for a conflict of interest, however, is no greater in the case of a corporation which seeks to enjoin a tender offer as violating the All–Holders Rule than it is in the case of a corporation which utilizes a provision of the Williams Act. Since the majority points to no principled reason to distinguish between the two, and I can think of none, I dissent from the majority's conclusion that a target company does not have standing to assert a violation of the All–Holders Rule.

### III.

Since I find that Polaroid does have standing to assert a violation of the All–

---

**4.** The Supreme Court has characterized all of the Williams Act provisions as disclosure provisions. *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 9, 105 S.Ct. 2458, 2463, 86 L.Ed.2d 1 (1985). As the majority acknowledges, even those provisions of the Williams Act that impose substantive requirements on the maker of a tender offer, such as the proration and best price provisions, were referred to by the Supreme Court in *Schreiber* as relating to "disclosure." *Id.* Thus, the Supreme Court's use of the

term "relating to disclosure" means something less than a provision requiring the dissemination of particular information. Given this background, I conclude that the All–Holders Rule is also "related to disclosure." Indeed, even the majority acknowledges that the All–Holders Rule is valid because it is "no less related to disclosure than are the proration and best price provisions," and because the SEC has articulated a disclosure justification for the Rule. Majority at 994–95.

Holders Rule, I must address whether it has demonstrated that it is entitled to preliminary injunctive relief. In my opinion, Polaroid satisfies each of the four elements for a preliminary injunction.

### 1. *Probability of Success*

Clearly, as I noted earlier, Polaroid has demonstrated that it will likely be successful in demonstrating that Shamrock's tender offer violates the All–Holder Rule. *See supra,* maj. op. at 990.

### 2. *Irreparable Injury*

Three arguments support a finding of irreparable injury in this case. First is the fact that Shamrock does not appear to have the resources to compensate the ESOP shareholders for the damages they will likely suffer if the tender offer closes, and they have not been accorded the opportunity to participate.

Second is the fact that the ESOP shareholders, who are employees of Polaroid, will be deprived of the influence in their employer's affairs that they have as significant shareholders in their employing corporation. That interest is manifest in this case. If the employees are satisfied with the present management, as shareholders they can use the influence (by not tendering) of their substantial position. Deprivation of a substantial ownership position in one's employer is not an interest that is readily compensable in money damages, particularly where shares in the successor corporation will not be publicly traded.

Finally, the ESOP shareholders have an interest in enjoying a full twenty days to evaluate any tender offer for their shares. If Shamrock amends its offer to include the ESOP shares, however, they will only have ten days to review the offer. The opportunity to have sufficient time to make an informed decision is also an irreparable interest.

### 3. *Other Interested Parties*

Aside from Polaroid, Polaroid's shareholders, and Shamrock, no other party appears to have an interest that would be harmed by the grant or denial of a preliminary injunction.

### 4. *The Public Interest*

This factor, to the extent it applies in this case, is clearly in favor of the enforcement of a valid regulation promulgated by the SEC. It weighs heavily in favor of injunctive relief.

### IV.

I concur in the majority's finding that Shamrock's offer violates section 14(e). However, the majority errs, in my opinion, when it concludes that Polaroid does not have standing to assert a violation of the All–Holders Rule. I would reverse the district court's denial of Polaroid's motion for preliminary injunctive relief on this ground, and remand this case to the district court for entry of an order preliminarily enjoining the tender offer because it likely violates both section 14(e) and the All–Holders Rule.

